## GRAVES et al. v. UNITED STATES.
### Civil Action No. 1706.

District Court, W. D. New York.

July 7, 1945.

Jacob Ark, of Rochester, N. Y., for plaintiffs.

George L. Grobe, U. S. Atty., of Buffalo, N. Y. (Marvin C. Taylor, of Washington, D. C., of counsel), for defendant.

BURKE, District Judge.

The government on June 29, 1943, through its agency, Metals Reserve Company, requisitioned from the plaintiffs 8268 pounds of bronze castings which had been designed for use as handle brackets for blowtorches. It was determined by the government that $1641.58 was fair compensation for the materials taken. The plaintiffs were unwilling to accept such determination. Pursuant to the statute, 50 U.S.C.A.Appendix, § 721, the government paid plaintiffs fifty percent of the amount so determined and the plaintiffs bring this action to recover an additional amount, which, when added to the amount already paid, will be just compensation.

The plaintiffs contend that market value of the requisitioned property is not the proper measure of compensation because there was no market value in the true sense, the property being especially made for handle brackets and not being a commodity that is freely bought and sold in the open market. The only evidence of value

produced by the plaintiffs was the cost of reproducing bronze castings, such as were taken.

Prior to the taking amended Conservation Order M–9–c, issued by the War Production Board, restricted the use of copper-base alloy in the manufacture of blow-torches and prohibited its sale for any non-permitted use. The availability of plaintiffs castings for use as handle brackets had been taken away by Conservation Order M–9–c. The governmental right to impose use restrictions is not challenged by the plaintiffs. At the time of the taking there was no available use for the requisitioned handle brackets as such nor was there any available use except for remelt or for sale to the government. The plaintiffs contend that they did have inherent value for subsequent use as handle brackets by the plaintiffs themselves as manufacturers of blowtorches. They introduced proof that formal appeals by them to the War Production Board for permission to use copper products for blowtorch tanks were allowed, on a number of occasions, both before and after the taking. There was no proof as to the likelihood of allowance of such appeals at the time of the taking. There was no proof as to market value except as scrap and sale to the Government under the Copper Recovery Program.

They contend further that, prior to October 21, 1943, the date which one of the plaintiffs testified that they first received an interpretation from the War Production Board that the term "tank" in order M–9–c included fittings, bronze handle brackets were not restricted for military orders. But the same witness testified that at the time their production had been converted to substitute steel tanks, prior to the taking on June 29, 1943, they were using steel handle brackets because there had been an interpretation by the War Production Board that all fittings of a tank were to be considered part of the tank in the interpretation of order M–9–c.

■ To say that there was no market for the requisitioned property as bronze castings is but another way of saying that the property was not available for use as bronze castings. But to say that the property had no market value is to ignore the fact that there was a ready market for it as remelt or for sale to the government, not the best possible use but the only available use, and that came about because of

the valid exercise of lawful war time powers in restricting the use of copper products. The plaintiffs cite Sinclair Refining Co. v. Jenkins Process Co., 289 U.S. 689, 53 S.Ct. 736, 77 L.Ed. 1449, 88 A.L.R. 496, as authority for the appraisal of value by reproduction cost. That suit was one for damages for breach of contract. The plaintiffs here are entitled to receive just compensation, not damages as for a breach. "A sufficient ground for the distinction lies in the fact that in the one case the requisition or cancellation is a lawful act under the power of eminent domain, while in the other the act constituting the breach is unlawful." DeLaval Steam Turbine Co. v. United States, 284 U. S. 61, 70, 52 S. Ct. 78, 79, 76 L.Ed. 168. Moreover the subject of appraisal in the Sinclair Refining case was a patent, in the language of the Court "a thing unique". There was in that case absence of market value. At page 697 of 289 U.S., at page 739 of 53 S.Ct., 77 L.Ed. 1449, 88 A.L.R. 496, the Court said: " * * * But the absence of market value does not mean that the offender shall go quit of liability altogether."

■ The plaintiffs cite authorities, United States v. New River Collieries Co., 262 U.S. 341, 43 S.Ct. 565, 67 L.Ed. 1014; Phelps v. United States, 274 U.S. 341, 47 S.Ct. 611, 71 L.Ed. 1083; Seaboard Air Line R. Co. v. United States, 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664, in support of the principle controlling in cases of the taking of private property under the power of eminent domain that the Government's obligation is to put the owner in as good a position pecuniarily as if the property had not been taken. That principle is applicable in the case at bar. It must be remembered, however, that the obligation relates to the position of the owners at the time of the taking, not at some time prior thereto before the plaintiffs' property had felt the effect of lawful governmental orders restricting its use and fixing maximum prices for its sale. The application of the principle poses the question: "What was the plaintiffs' position at the time of the taking?" They had on hand bronze castings which they could not use themselves unless permitted to do so by appeal to the War Production Board, nor could they sell them for use as bronze castings or for any other use that was prohibited. They could have sold them to a purchaser who desired to hold them until the lifting

of the restrictive regulations, but there was no evidence of any market for such purpose. There was a ready market for the castings as remelt but that too had felt the force of maximum price regulations. Under Office of Price Administration regulations the price for remelt was limited to 10¼ cents per pound. These governmental restrictions, unquestionably lawful and general in their scope, affecting not only plaintiffs' property but all property in its class, were actualities which circumscribed the market. A court in evaluating property requisitioned by the government may not ignore their effect. Whatever may have been plaintiffs' damage because of these restrictions, it may not be reflected in fixing just compensation for the taking. Plaintiffs' loss because of the restricted market was the result, not of the taking, but of lawful governmental action in imposing restrictions as to use and fixing ceiling prices, for which the law affords no remedy. Omnia Commercial Co. v. United States, 261 U.S. 502, 510, 43 S.Ct. 437, 67 L.Ed. 773. " * * * when competent authority has fixed prices at a maximum, or has denied owners some specific use of their property, it is patently a disregard of its authority, either indirectly to allow a higher price on condemnation, or to allow the price to be figured in disregard of the limitation imposed." United States v. Delano Park Homes, 2 Cir., 146 F.2d 473, 474.

For the purpose of securing copper for use in the prosecution of the war, the government inaugurated the Copper Recovery Program to secure idle and excess inventories of copper products. For copper products which could not be utilized in their existing state because of use restrictions the government offered certain fixed prices according to grade. The price fixed for the grade in which plaintiffs' castings were classified was 19.93 cents per pound. That price was offered to the plaintiffs and refused by them. It was universally offered by the government to holders of copper products of a class similar to plaintiffs' bronze castings. The Copper Recovery Program established a legal market for plaintiffs' property in excess of the maximum scrap price set by the Office of Price Administration. When the Copper Recovery Program prices were being generally offered the government was not committed to the requisitioning of copper products. Cf. United States v. Miller, 317 U.S. 369,

372, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55. The price fixed by the Copper Recovery Program afforded a market for plaintiffs' property and that market was the best available market. The plaintiffs are entitled to recover as compensation for their property the value thereof as fixed by the Copper Recovery Program less the amount received on account. Findings and Conclusions are filed herewith.

## Findings of Fact

1. On June 29, 1943, the United States, through its agency Metals Reserve Company, requisitioned and took from the plaintiffs 8268 pounds of bronze castings.

2. The plaintiffs were engaged as manufacturers of blowtorches. The requisitioned castings had been designed and cast especially for the use of plaintiffs as handle brackets for blowtorches.

3. Prior to June 29, 1943, Amended Conservation Order M-9-c issued by the War Production Board prohibited the use of bronze handle brackets in the manufacture of blowtorches and prohibited their sale for that use or for any prohibited use.

4. On June 29, 1943, there was no market for the requisitioned bronze castings in their existing state. There was no market except as scrap and except the market created by the government under the Copper Recovery Program. No use of copper products prohibited by Conservation Order M-9-c could be made, except as allowed by appeals to the War Production Board. Appeals had been allowed before that date on the application of the plaintiffs to use copper base alloys in blowtorch tanks for emergency orders and on several occasions after June 29, 1943, the War Production Board allowed the use of copper base alloys in the manufacture of blowtorch tanks on the plaintiffs' applications.

5. There was no evidence, however, that on June 29, 1943, there was any likelihood of the allowance of appeals for the use of copper base alloys in the manufacture of blowtorches.

6. Prior to June 29, 1943, plaintiffs had converted their manufacturing methods to the use of steel handle brackets in the manufacture of blowtorches in accordance with an interpretation by the War Production Board that all fittings of a tank were to be considered part of the tank under Copper Order M-9-c.

7. Prior to June 29, 1943, the Office of Price Administration, acting pursuant to the authority derived from the Emergency Price Control Act, established a nation-wide price ceiling for copper base alloy scrap. Under this regulation the maximum price for copper base alloy scrap was 10¼¢ per pound. If sold as scrap the maximum scrap price of plaintiffs' bronze castings would have been 10¼¢ per pound. There was a ready market for plaintiffs' castings as scrap at this price.

8. To secure copper for use in the prosecution of the war the government inaugurated the Copper Recovery Program to secure copper products in idle or excess inventories.

9. Under the Copper Recovery Program the government offered generally to holders of copper products of the class in which plaintiffs' castings fell a price of 19.93¢ per pound.

10. The action of the government in establishing a price for copper base alloy products created a market for said products at the prices fixed by said program. At that time the government was not committed to a plan of requisitioning copper base alloy products from private holders thereof.

11. The government offered to purchase the bronze castings held by the plaintiffs at the price established by the Copper Recovery Program of 19.93¢ per pound. This price was refused by the plaintiffs.

12. The reproduction cost of the requisitioned castings on the date of the taking was $3916.10. In addition thereto it would have been necessary to expend the sum of $152.95 for embellishment of the reproduced castings to place them in the condition of the castings which were actually requisitioned, making a total of $4069.05.

13. The fair market value of the requisitioned castings on the date of the taking was the Copper Recovery Program price of 19.93 cents per pound or $1647.81, on account of which plaintiffs have received $815.79.

### Conclusions of Law

1. Plaintiffs' property was lawfully requisitioned under the statute. 50 U.S. C.A.Appendix, § 721.

2. The market for plaintiffs' property on June 29, 1943, the date of the taking, had been limited by lawful use restrictions imposed by the War Production Board and by lawful maximum price regulations for scrap fixed by the Office of Price Administration.

3. The best available market for plaintiffs' property on the date of the taking was at the price fixed by the Copper Recovery Program.

4. Any loss sustained by the plaintiffs because of the limited market caused by lawful governmental regulations as to allowable use and maximum prices for scrap, may not be reflected in computing fair compensation.

5. Plaintiffs are entitled to recovery as the fair market value of their property $1647.81, less $815.79 heretofore paid on account.