**WALKER et al. v. UNITED STATES.**

No. 45369.

Court of Claims.

Feb. 4, 1946.

WHITAKER, Judge, dissenting.

———◆———

Karl T. Frederick, of New York City (Paul F. Myers, of Washington, D. C., on the brief), for plaintiffs.

Kendall M. Barnes, of New York City, and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and JONES, LITTLETON, and WHITAKER, Judges.

WHALEY, Chief Justice.

The plaintiffs are silk merchants and brokers. On March 13, 1942, they owned, and had continuously owned on and from July 25, 1941, certain bales of raw silk, warehoused by the United States Testing Co., Inc., at Hoboken, New Jersey.

One hundred of these bales are involved in this controversy, with a total "conditioned weight plus 2%" (as it is called) of 13,610.10 pounds, all imported from Japan. They were requisitioned by the Government March 13, 1942, under the act of October 16, 1941, 55 Stat. 742, as amended, 50 U.S.C.A.Appendix, §§ 721–724. The plaintiffs were awarded therefor by the War Production Board $42,300.29 as fair and just compensation, but being unwilling to accept that amount, they were, on January 11, 1943, in accordance with the act, paid one-half, or $21,150.14, and now sue to recover "an additional amount", in the words of the statute, "which, when added to the amount so paid to him, he considers to be fair and just compensation."

The suit is for $74,120.56 on the basis of $95,270.70 as just compensation at the time and place of taking, together with interest on $95,270.70 March 13, 1942, to January 11, 1943, and interest on $74,120.56 from January 11, 1943.

Only one issue is presented, and that is the amount of just compensation at the time and place of taking, under the well-known provision of the Fifth Amendment— "nor shall private property be taken for public use, without just compensation."

Certain further circumstances require narration, for they indicate the presence or absence of a market which gives values that can be made use of.

On July 26, 1941, the President by Executive Order 8832, 12 U.S.C.A. § 95a note, froze all Japanese assets in this country, and at that time, and some years prior thereto, Japan had produced about 85 percent of the raw silk used here. Importations of raw silk from Japan ceased within a few days after that date.

Likewise, on July 26, 1941, the Director of Priorities, Office of Production Manage-

ment, issued General Preference Order M–22[1] which required special authorization by the Director for making or accepting domestic deliveries of raw silk. The order also limited the processing of *thrown* silk, unless authorized by the Director, to the amount processed in the immediately preceding period.

On that date also, July 26, 1941, the Administrator, Office of Price Administration and Civilian Supply, wired the Commodity Exchange in New York City, being the principal market there for the purchase and sale of raw silk: "Because of uncertainty in Far Eastern situation and decision of this office to set maximum prices for silk, believe it very important in public interest that trading in silk on Commodity Exchange be suspended until situation clarifies." Thereupon the Commodity Exchange ceased trading in silk.

On August 2, 1941, two things happened. First, General Preference Order was amended by providing that after midnight on that date *raw* silk could not be processed without special authorization of the Director of Priorities, and second, the Office of Price Administration issued Price Schedule No. 14, fixing ceiling prices on raw silk bought, sold, or delivered on and after August 4, 1941. The ceiling price which we shall here refer to was $3.08 on grade D–78, the basic price on which prices for other grades were commonly computed.

There followed other amendments of General Preference Order M–22 which described in some detail the terms of Government control over raw silk, and they were unquestionably restrictive. As to the hundred bales here involved about all that the plaintiffs had thereafter was a legal title.

The Defense Supplies Corporation proceeded to buy up raw silk at the ceiling prices set, where the owner would sell, and the method used by that corporation was decidedly more in the nature of demand than solicitation.

Where purchase could not be effected, requisition was resorted to, all at the established ceiling prices.

The plaintiffs' one hundred bales were taken by the defendant March 13, 1942, together with 60 other bales of the plaintiffs'. The plaintiffs accepted the ceiling price on the 60 bales and they are not otherwise involved in this case, but they refused to accept the basic ceiling price of $3.08 on the one hundred bales. They offered to accept net cost if immediate settlement was made, claiming, however, that they were entitled to fair market value as fair and just compensation. This basis of settlement was refused by the War Production Board, compensation being awarded on the basis of $3.08, the basic ceiling price.

We call it the "ceiling price," but in fact the ceiling price had been revoked by the Office of Price Administration February 18, 1942, effective February 19, 1942, with the statement: "Since issuance of Price Schedule No. 14 substantially all stocks of silk in this country have been acquired by the United States Government, through agencies thereof, or are presently in the hands of manufacturers fabricating materials in fulfillment of government contracts."

When the plaintiffs' last bales, numbering 160, were requisitioned, March 13, 1942, there were also requisitioned 440 bales owned by another party. This total, 600 bales of raw silk, was all the raw silk left in the country not in Government hands.

 In this situation, with only 600 bales outstanding in the country, of which the plaintiffs had 160, or nearly one-fourth, the market had simply disappeared. Six hundred bales out of a current supply of some 100,000 bales are next to nothing. The plaintiffs, the defendant, a third party, and 600 bales, did not constitute a market. A market is not a mere name, without substance. A market price, much less a "fair" market price, cannot be distilled out of the dry air.

 Much of the argument in this case is devoted to the question of a fair market price. But the direct question in this case is that of just compensation. The two terms are not synonymous, and the absence of a fair market price does not prevent recovery of just compensation. Nor is one required to remake the world and speculate on what would be a fair market price if conditions were different with imaginary barter and trade.

[1] General Preference Order M–22 was issued under the authority of the Act of June 28, 1940, 54 Stat. 676, as amended by the Act of May 31, 1941, 55 Stat. 236, 50 U.S.C.A.Appendix, § 1152.

We must determine just compensation without the aid of a concurrent market price.

█ It was said in Seaboard Air Line Ry. v. United States, 261 U.S. 299, 304, 43 S.Ct. 354, 356, 67 L.Ed. 664, with reference to just compensation: "It rests on equitable principles and it means substantially that the owner shall be put in as good position pecuniarily as he would have been if his property had not been taken."

█ The plaintiffs are entitled, not to recovery in kind at the time and place of taking, for that would mean there could be no real taking, but to an equivalent in money. The compensation is pecuniary.

The matters that the court may take into consideration in determining that equivalent have some range. This is illustrated in Brooks-Scanlon Corporation v. United States, 265 U.S. 106, 125, 44 S.Ct. 471, 475, 68 L.Ed. 934. In that case a contract for the construction of a ship had been expropriated. As to ascertaining the value of that which had been taken the Supreme Court said: "Determination of just compensation is to be based on the fact that claimant's contract and its rights and interest thereunder were expropriated, and that it is entitled to have their value at the time of the taking. The value of such ships at the time of requisition, and the then probable value at the time fixed for delivery, the contract price, the payments made and to be made, the time to elapse before completion and delivery, the possibility that by reason of the government's action in control of materials, etc., the contractor might not be able to complete the ship at the date fixed for performance, the loss of use of money to be sustained, the amount of other expenditures to be made between the time of requisition and delivery, together with other pertinent facts, are to be taken into account and given proper weight to determine the amount claimant lost by the taking [citing cases], that is, the sum which will put it in as good a position pecuniarily as it would have been in if its property had not been taken."

In what pecuniary position were the plaintiffs at the time and place of taking, with their one hundred bales of raw silk?

█ This is not a case where the Government acts in the dual capacity of contractor and sovereign. The taking was an act of sovereignty; the destruction of the market was an act of sovereignty.

In evaluating plaintiffs' situation at the time of taking we cannot resort to anything but realities. The plaintiffs held title to the bales, but could not sell them to whom they pleased, nor could they make use of them as they pleased.

█ While at the time of requisition the ceiling price had been revoked, General Preference Order M–22 was still in effect. The lifting of the ceiling price therefore aided plaintiffs not a bit, for they could sell only to Defense Supplies Corporation, and Defense Supplies Corporation could name its own price. There was no bargaining. It is not apparent why, after General Preference Order M–22 went into effect, a formal ceiling price was established at all. The reason given for revocation of the order, especially in view of the fact that not all stocks had been acquired, is not convincing. Lack of foundation for issuance of the order in the first instance, as to raw silk, may have had its influence in a premature revocation. Such a situation is all the more reason why the ceiling price cannot be considered as conclusive in determining just compensation.

The plaintiffs argue strenuously that if the so-called ceiling price of $3.08 is to be considered just compensation, because it is the regularly established ceiling price, then the Fifth Amendment goes by the board. But at the time of taking $3.08 was not the ceiling price, in fact there was no ceiling price. The ceiling price of $3.08, as such, has no place in consideration of the issue, except as it indicates there really was an upward surge which the Office of Price Administration might have had in mind to forestall.

The cases cited and quoted at length by the defendant in its supplemental brief, Lessner Plumbing Co. v. United States, U. S. District Court, Southern District of New York, June 25, 1945, Graves, et al. v. United States, D.C., 62 F.Supp. 231, and Louisville Flying Service v. United States, U. S. District Court, Western District of Kentucky, Louisville Division, July 20, 1945, are not entirely in point, because either a ceiling price was in effect or there existed a market, conditions which did not obtain here at the time of taking.

█ It will be observed that plaintiffs accepted the price of $3.08 on 60 of the 160 bales and refused that price on the remaining 100 for the reason that such price would not enable it to recover its

cost. But cost is not an element of just compensation. The reason for that is not hard to seek, if the measure of just compensation is to be the plaintiffs' pecuniary position. The value present at the time of taking represents the plaintiffs' pecuniary position at that time. If the plaintiffs had purchased the requisitioned goods at an abnormally low price, just compensation would not be lowered proportionately. Nor can just compensation be increased because the cost m'ght have been abnormally high. In United States v. New River Collieries, 262 U.S. 341, 344, 43 S.Ct. 565, 567, 67 L.Ed. 1014, it was said: "The owner's cost, profit, or loss did not tend to prove market price or value at the time of taking, and was therefore immaterial."

In United States v. General Motors Corporation, 323 U.S. 373, 379, 65 S.Ct. 357, 360, 156 A.L.R. 390, the court said: "In the light of these principles it has been held that the [just] compensation to be paid is the value of the interest taken. Only in the sense that he is to receive such value is it true that the owner must be put in as good position pecuniarily as if his property had not been taken. In the ordinary case, for want of a better standard, market value, so-called, is the criterion of that value. In some cases this criterion cannot be used either because the interest condemned has no market value or because, in the circumstances, market value furnishes an inappropriate measure of actual value."

In the case we have here the last quoted market price was $3.65 per pound, July 25, 1941, but this was inflationary, representing a jump from $3.075 July 21, 1941. This sudden increase, as the findings state, was due principally to "the unsettled political relationship between this country and Japan which had produced a fear of an embargo on shipments from Japan, including raw silk, and an order freezing Japanese assets."

The situation thus presented was a cutting off of supply and an aggravation of demand.

The prevailing, indeed apparently the only, price at the time and place of taking, or within a reasonable time before that, was $3.08. No one was getting any excess over that price.

■ This price had one important characteristic of a market price—it was and for some time had been universal. More than that, it did not fluctuate, as market prices do. One might well wonder, as people sometimes do, whether market prices are reasonable or not. But as to raw silk and its price of $3.08 all were treated alike. There was no discrimination, and just compensation must also be free of discrimination.

■ The determination of just compensation under the Fifth Amendment is exclusively a judicial function. This is now undisputed and requires no citation of authority.

As to fixing of maximum or ceiling prices, the Price Administrator derived his authority from the Act of January 30, 1942, 56 Stat. 23, 50 U.S.C.A.Appendix, § 901 et seq. Among other things, the declared purpose of this Act was "to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency."

Section 2(a) of that Act also provided: "Whenever in the judgment of the Price Administrator (provided for in section 201) the price or prices of a commodity or commodities have risen or threaten to rise to an extent or in a manner inconsistent with the purposes of this Act, he may by regulation or order establish such maximum price or maximum prices as in his judgment will be generally fair and equitable and will effectuate the purposes of this Act. So far as practicable, in establishing any maximum price, the Administrator shall ascertain and give due consideration to the prices prevailing between October 1 and October 15, 1941 (or if, in the case of any commodity, there are no prevailing prices between such dates, or the prevailing prices between such dates are not generally representative because of abnormal or seasonal market conditions or other cause, then to the prices prevailing during the nearest two-week period in which, in the judgment of the Administrator, the prices for such commodity are generally representative), for the commodity or commodities included under such regulation or order, and shall make adjustments for such relevant factors as he may determine and deem to be of general applicability, including the following: Speculative fluctuations, general increases or decreases in

costs of production, distribution, and transportation, and general increases or decreases in profits earned by sellers of the commodity or commodities, during and subsequent to the year ended October 1, 1941."

In fixing upon the unit basic price of $3.08 per pound as the actual and applicable value, the court does so in the exercise of its judicial functions, independently of any conclusion arrived at by the Price Administrator. That the ceiling price fixed by the Price Administrator happens to be the value here found by the court, is not surprising in view of the statutory basis by which the Administrator was bound.

Taking all these factors into consideration, we have found that the basic price of $3.08 per pound represents the actual value of the silk taken at the time it was taken. The compensation to be awarded is the actual value at the time of taking and to make it just compensation an additional allowance must be made to the time of judgment to make the claimant whole. This takes the form of annual interest which, in this case, will be four percent.

This will result in recovery for plaintiffs in the unpaid balance of $21,150.15 to which interest is to be added.

The bales were requisitioned March 13, 1942. The defendant at that time was not ready to make payment and did not make any payment until January 11, 1943, the intervening time being taken up by the War Production Board in arriving at a final award. The plaintiffs are therefore entitled in order to make the compensation just to interest on $42,300.29 for the period March 13, 1942 to January 11, 1943. A fair and reasonable rate in this instance is four percent per annum which for that period increases the compensation by $1,400.61. The plaintiffs having elected to receive only one-half of the amount tendered, no interest is allowable after January 11, 1943. Luckenbach S. S. Company v. United States, 272 U.S. 533, 542, 47 S. Ct. 186, 71 L.Ed. 394.

The question of using a price on thrown silk as a basis for calculating back a value on raw silk is considered to be not controlling in this case. We have therefore deemed it unnecessary to discuss the matter. We also leave out of the discussion for the same reason the prices on other than Japanese silk.

The plaintiffs are entitled to recover a total of $22,550.76. It is so ordered.

JONES and LITTLETON, Judges, concur.

WHITAKER, Judge (dissenting).

In Brooks-Scanlon Corporation v. United States, 265 U.S. 106, 44 S.Ct. 471, 475, 68 L.Ed. 934, it was said that just compensation is "the sum that would in all probability result from fair negotiations between an owner who is willing to sell and a purchaser who desires to buy." This is repeated in substance in Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890, and in United States v. General Motors Corporation, 323 U.S. 373, 65 S.Ct. 357, 156 A.L.R. 390.

It is also defined in these cases as "the sum which will put it (the owner) in as good a position pecuniarily as it would have been in if its property had not been taken."

The sense of both of these definitions has been put succinctly in these words, quoted in Standard Oil Co. of New Jersey v. Southern Pacific Co., supra [268 U.S. 146, 45 S.Ct. 467], "The worth of a thing is the price it will bring."

Now, as I understand it, it is said that by the rule stated in these definitions $3.08 is just compensation for the silk because that is all the plaintiffs could have gotten for it had the defendant not taken it. That is true, but it is true only because the defendant itself so decreed; it prohibited the sale of the silk to anyone other than itself or its alter ego, and it had fixed this as the highest price that could be paid for it. Except for this, the proof is abundant that a much higher price could have been obtained for it.

Now, no one doubts that the Government has the war power to fix prices and to punish people who sell at higher prices, but it does not follow that this is the price it must pay when it takes property. This is the price it must pay only if this is "just compensation"; and "just compensation" has been defined as the amount that could have been obtained for it as the result of fair negotiations with one who desired to buy. It is not the amount a person is forced to pay or forced to take. $3.08 is the price plaintiffs were forced to take. Had they been free to get the best price they could on an open market they

would have been able to get eight or ten dollars or more. According to the rule stated in the above-mentioned authorities, plaintiffs are entitled to recover whatever sum they could have gotten on the open market.

But I do not think this rule is without limitation. The constitution requires "just compensation." A price of eight dollars is four times the average price at which silk had sold in the previous ten years and twice the highest price at which it had sold in this period and about seven times the lowest price it had sold for. Such a price seems to me to exceed "just compensation."

It is an inflated price, one brought about by abnormal conditions. It has no relation to the intrinsic worth of the article. It is one that will continue only so long as these abnormal conditions continue.

The country was at war and it needed plaintiffs' silk to carry on the war. The 100 bales plaintiffs had and 440 other bales were all the silk in the country. If plaintiffs had been entitled to haggle for a price they could have gotten almost anything they demanded but I do not believe they had the constitutional right to thus take advantage of their country's extremity and to demand of it an unconscionable price merely because they could get it. This is not the "just compensation" required by the constitution. Had plaintiffs done so, their countrymen would hardly point to either of them and say, "Behold a just and an upright man."

In times of war, just compensation is not the amount a profiteer would charge and could get, or the price that could be obtained on the "black market." But, on the other hand, I do think that plaintiffs were entitled to what it is reasonable to suppose they would have realized on an open market in normal times.

In December 1939 when this country was at peace the price of silk was $3.93 a pound. This is the highest average monthly price at which it had sold in the ten years immediately preceding the requisition. I think plaintiffs are entitled to this much, since this is not exorbitant and since they could have gotten much more than this except for the Government's restrictions.

At the time further sales were prohibited by the Government the market had risen to $3.65 a pound. This was not an exorbitant price. On the one hand, it was higher than silk had sold for in the last ten years, except during the months of November and December 1939; and, on the other hand, it was lower than it had sold for in 1928 and 1929 and other prior years. From July 1928 to June 1929 it had sold at prices ranging from $4.86 to $5.30 and from July 1929 to June 1930 it had sold at prices ranging from $3.56 to $5.20.

Since the last free sale of silk was at the price of $3.65 and since this was not an exorbitant price, I can see no warrant for denying plaintiffs' recovery of at least this much. There can be no doubt that they would have been able to get this much as the result of fair negotiations with a buyer desiring to buy except for the Government's restrictions. They are entitled to at least this much, since this is not an exorbitant price.

The price fixed by the Office of Price Administration is, of course, not controlling in arriving at just compensation. We are not told upon what basis it was fixed or what factors were taken into consideration in arriving at it. It appears to be the highest yearly average price at which silk had sold in the last ten years. I think plaintiffs are entitled to more than the average yearly price, since they could have gotten much more on the open market. I think they are entitled to the highest price at which silk had sold on normal markets in recent years. This was $3.93.

I would add a finding to show these prices and I would give judgment on the basis of $3.93 a pound, or not less than $3.65 in any event.

MADDEN, Judge, took no part in the decision of this case.