**EDWARD P. STAHEL & CO., Inc., v. UNITED STATES (and eight other cases.)**

Nos. 46498–46504, 46556, 46557.

Court of Claims.

June 28, 1948.

WHITAKER and HOWELL, Judges, dissenting.

William A. Roberts, of Washington, D. C. (Irene Kennedy, Warren Woods, and Roberts & McInnis, all of Washington, D. C., on the brief), for plaintiffs.

Kendall M. Barnes, of New York City, and H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

MADDEN, Judge.

The plaintiffs in these nine cases sue for additional compensation for raw silk acquired from them by the Government in transactions described fully in our findings and briefly hereinafter in this opinion. They urge that the Government "took" their silk for public use within the meaning of the Fifth Amendment to the Constitution of the United States and that the price which it paid them for it was less than the just compensation provided in the Constitution. We have concluded that the amount which the Government paid them was, so far as concerned the principal amounts paid to each of the plaintiffs, just compensation in the constitutional sense. This conclusion would relieve us of the task of deciding whether the events which occurred amounted to a taking in the constitutional sense, were it not for the fact that the payments made by the Government were made some months later than the time of the asserted taking, hence, if there was a taking, the plaintiffs are entitled to interest as a part of the just compensation, for the period between taking and payment.

On July 25, 1941, each of the plaintiffs was the owner of a quantity of raw silk. In the afternoon of that day the President announced at a press conference that he intended to take action "freezing" Japanese assets in this country. On July 26 he issued Executive Order No. 8832, 12 U.S.C.A. § 95a note, making illegal all financial payment or transfers of money, credit or property to or for the account of Japan or any national of Japan, unless the transaction was licensed as provided in the order. The order had the effect of terminating all commercial transactions in raw silk with Japanese nationals. Japan had been the source of supply for practically all the raw silk used in this country.

On July 26, the same day that the President's Executive Order was issued, the Office of Production Management issued General Preference Order M–22, the full text of which is given in finding 9. This order prohibited the delivery or acceptance of raw silk without the specific authorization of the Director of Priorities, and prohibited all persons from processing thrown silk at a rate greater than the rate at which each person had processed it dur-

ing the week ending July 26, 1941. Also on the same day, July 26, Mr. Henderson, the Administrator of the Office of Price Administration and Civilian Supply, sent a telegram to the Commodity Exchange, the only market in New York for the purchase and sale of future contracts in raw silk, saying that he believed it important in the public interest that trading in silk on the Commodity Exchange be suspended "until situation clarifies." The Exchange did suspend trading in silk, and such trading was not resumed until 1945. Also on July 26, Mr. Henderson announced that within a few days his office would impose a price ceiling on raw silk at approximately the price at which it had sold in the markets on July 21. On August 2, a price ceiling of $3.08 per pound for "base grade" 13/15 denier Japan white silk, grade D–78, was imposed, with corresponding prices for other grades. This decision to impose a price ceiling, and the determination of the figure at which the ceiling was placed, were made in the Office of Price Administration, without consultation with other Government agencies as to the policy which would be served by such action.

Also on August 2, the Office of Production Management amended its previous preference order and forbade all processing of raw silk unless specifically authorized by the Director of Priorities. On August 12 the order was again amended to permit deliveries of raw silk to Defense Supplies Corporation, a Government agency, or pursuant to its instructions.

On October 16 the Office of Production Management rewrote its preference order relating to raw silk. The full text of the new order appears in our finding 14. Its effect was to require any owner of raw silk to accept an order from and sell his silk to any person who intended to use it to fulfill his contract to manufacture parachutes for the Government, or to accept an order for and sell his silk to the Defense Supplies Corporation, a Government agency. In an amendment of this order made on October 28, each owner of raw silk was required to make a report in writing to the Office of Production Management of the raw silk that he had on hand.

About September 1, 1941, Defense Supplies Corporation sent to various holders of raw silk a form of purchase contract known as "D. S. C. Silk No. 1," with a letter offering to purchase silk at the ceiling prices. These letters and contracts made no mention of priority orders. Some silk was obtained as a result of these letters. About December 22 the Defense Supplies Corporation adopted a new form of contract, "D. S. C. Silk No. 3," which contained a specific reference to the October 16 amendment to the General Preference Order making acceptance mandatory. Copies of this form were sent on December 23 to all known holders of raw silk with a letter saying that the form was an order for all silk then owned by the recipient, that the order bore a preference rating of A—10, and that its acceptance was mandatory. See finding 20.

Using form "D. S. C. Silk No. 3," the Defense Supplies Corporation purchased some 30,000 bales of silk in January and February 1942, and some 2,200 bales during the last ten months of that year. Ceiling prices were paid for all this silk. In January 1942, the Defense Supplies Corporation began selling silk, disposing of most of its stock in 1942, and of smaller quantities in 1943, 1944, and 1945. All its sales were made at the $3.08 price which had, as we have seen, been fixed as the ceiling price, although the price schedule fixing this ceiling had been revoked on February 18, 1942, for the stated reason that "substantially all stocks of silk in the country have been acquired by the United States Government, through agencies thereof, or are presently in the hands of manufacturers fabricating materials in fulfillment of Government contracts."

On February 10, 1942, the War Production Board, pursuant to the Act of October 16, 1941, 55 Stat. 742, Title 50 U.S. C.A.Appendix, § 721, requisitioned and took over some 13,511 bales of raw silk then located in nine warehouses. On the same day it amended its preference order to prevent the sale or delivery of raw silk to or the purchase and receipt of raw silk from any one other than Defense Supplies Corporation.

On November 24, 1941, the law firm of Roberts and McInnis, who represent the plaintiffs in these cases, filed with the Office of Production Management and the Office of Price Administration a petition on behalf of eighteen members of the silk industry, including six of the plaintiffs in these cases, requesting an increase in the ceiling price of raw silk from $3.08 to $3.70 per pound. This petition was not granted. On January 8, 1942, the same lawyers acting for twelve holders of raw silk, including four of the plaintiffs in these cases, requested permission from the Defense Supplies Corporation to add to the contract, "D. S. C. Silk No. 3" which had been sent them, provisions which would have given them the benefit of any higher price for silk subsequently fixed by the Government, and which would have prevented their execution of the offered contracts from being waivers of "any right to seek hereafter adjustment of the consideration." These requests were denied.

On January 14 the same lawyers wrote the Defense Supplies Corporation that their clients would comply with the orders for silk placed with them, but that they did not hereby waive their right to "seek hereafter an equitable adjustment of the consideration." Another letter to similar effect was written April 10, 1942, to the interested Government agencies.

Four of the nine present plaintiffs were parties to all of the protests described above. Two were listed in the letters of November 24 and April 10. Three were not parties to any of the protests. The facts relating to the protests appear in finding 26.

Our findings 29–50 show that in December 1941 or January 1942, except for some six pounds of silk mentioned in finding 50, the plaintiffs executed contracts pursuant to orders for silk received by them from the Defense Supplies Corporation. The orders accepted were all on form "D. S. C. Silk No. 3" except two, which are mentioned in findings 30 and 43. All the sales were made at least two months after the October 16 order of the Office of Production Management had been promulgated, which required owners to sell their silk, upon request, to Government contractors for parachutes, or to the Defense Supplies Corporation, and forbade owners to use their silk unless specifically authorized by the Director of Priorities. For the silk acquired from the plaintiffs by the Government and here sued for, the Government paid them at the ceiling price rate of $3.08 per pound for standard-grade silk. The last sale of such silk on the last day that there was a free market for it, July 25, 1941, was at the price of $3.57 per pound.

The plaintiffs say that the President's order of July 26, 1941, forbidding transactions with Japan and Japanese nationals, and the price fixing and priority orders of the next few days, constituted a taking of their silk for Government use, within the meaning of the Fifth Amendment. They apparently fix upon the approximate date of July 26 in order to bring the asserted taking close to the last day of free trading in silk, July 25, and thus strengthen their claim to the market price of that day. They have, therefore, attempted to prove that the activities of the several interested Government agencies beginning on July 26, 1941, and continuing down to February 10, 1942, and March 17, 1942, on which dates the War Production Board took by eminent domain all the raw silk not already in the possession of the Government or its contractors, were all a part of a preconceived plan for the Government to acquire all the raw silk in the country for its own use, and at a price set by itself. The plaintiffs have not proved such a preconceived plan. The fixing of a ceiling price by the Office of Price Administration immediately after the President's Order which in effect shut off further importations of raw silk was not a part of any such plan. It was a recognition that no more of this essential commodity could be lured into the country by letting prices increase and that the scarcity which would result from shutting off the supply would probably cause prices to rise unreasonably. The decision was made by officials at an operational level who were not in consultation with officials of other Government agencies interested in the use of silk.

We restate the substance of the priority orders which were made by the War Production Board beginning on July 26, 1941, and down to the order of October 16, 1941. (1) That of July 26 forbade the delivery or receipt of raw silk unless authorized by the Director of Priorities, and forbade the processing of any more silk during any week thereafter than had been processed by the same holder in the week preceding the order. (2) That of August 2 forbade entirely the processing of any raw silk unless specifically authorized by the Director of Priorities. (3) That of August 12, 1941, authorized the delivery of raw silk to, or pursuant to the instructions of the Defense Supplies Corporation. (4) That of October 16 provided that the orders of contractors having contracts with the Government for the manufacture of parachutes or the orders of the Defense Supplies Corporation, had to be accepted and filled by owners of silk.

We think· that, by its order of October 16, the Government took the plaintiffs' silk for public use. It required the plaintiffs to sell their silk, upon request, to those who would use it for the Government's purposes, or to the Government itself, and it forbade the delivery or use of the silk for any other purpose except by the specific license of the Government, which license, so far as appears, was in no case granted. We think that, at some time before this order was issued, the Government had made up its mind that all the raw silk in the country was needed for public use, and that it would employ the procedure of granting priority to its own uses and making acceptance of requests to purchase for that use mandatory, to obtain the silk for that use. Not until October 16, 1941, the day of the issuance of the order here under discussion, was there a statute directly authorizing the taking of such property by the normal eminent domain proceeding. See 55 Stat. 742, Title 50 U.S.C.A.Appendix, § 721. Until that statute became a familiar working tool to the agencies of the Government which had the responsibility for obtaining for the Government what it needed for public purposes, they used whatever device was at hand. But to say that when the Government forbids an owner of property to make any other use of it, and requires him to sell it, upon request, to the Government, or its designee who will use it for a Government purpose, is not a taking of the property for public use, would be to make the constitutional right contingent upon the form by which the Government chose to acquire the use of the property.

We think that the fact that two of the plaintiffs executed the form "D. S. C. Silk No. 1" which did not say that acceptance of the order was required was not important. They did this many weeks after the order of October 16 had been issued, and it was the rule, whether recited on the form or not, that acceptance was required. If they had not executed the No. 1 form they would, no doubt, within a few days have received the No. 3 form, as the other plaintiffs did, which form expressed the mandatory character of the order.

The Government urges that it was, by its priority orders, merely making rules in its sovereign capacity and should not be pecuniarily liable for their harmful consequences to individuals. It cites Horowitz v. United States, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736, affirming 58 Ct. Cl. 189, and the several cases in this Court, the latest being Clemmer Construction Co. v. United States, 71 F.Supp. 917, 108 Ct.Cl. 718, which discuss this doctrine. But the taking of property by the sovereign for public use, though unquestionably an act of sovereignty, does not, under our Constitution, leave the sovereign immune from having to pay compensation for the taking. The Fifth Amendment expressly imposes liability.

Having concluded that there was a taking, in the constitutional sense, we must determine whether the plaintiffs received just compensation. They were paid the ceiling price of $3.08 per pound which had been fixed on August 2, 1941. This had been the market price on Monday, July 21. In the following four days, the last days of trading in silk, the price in the market had risen rapidly so that on Friday, July 25, the closing price in the Commodity Exchange, for delivery with-

in the month of July was $3.65, and the last actual sale on the spot market was at $3.57. As we have said, the plaintiffs claim that their property was taken on July 26, and that the market price of the day before, which was the last day of a free market, should be the measure of just compensation. We do not find from the evidence before us that a taking occurred before October 16, 1941. We must, therefore, determine the price which would give the plaintiffs just compensation for the taking of their silk for public use on or about that date. The Government urges that the ceiling price of $3.08 per pound, which price the plaintiffs have already been paid, constituted just compensation. The plaintiffs say that the Government may not set a ceiling price below the market price for the purpose of keeping down the amount which an owner shall be paid when his property is subsequently taken for public use. We agree with this contention of the plaintiffs but, as we have said, the plaintiffs have not proved that the ceiling price of silk was set for that purpose. It was, so far as appears, set for the normal purpose of protecting the public economy against inflation, and of protecting users of silk from being charged unduly high prices. The Government later became a beneficiary of the lower prices maintained by its ceiling, but it did do so only in the same way that it benefited by the controlled prices of most other commodities which it, along with others, purchased. The plaintiffs "vigorously challenge" the authority of the Office of Price Administration to fix the ceiling which it fixed on August 2, 1941, because at that time no express statutory authority to fix prices had been given. But the plaintiffs do not elaborate the point, nor cite any authority for their position except an obiter statement in O'Neal v. United States, 6 Cir., 140 F.2d 908. We do not, on the basis of the plaintiffs' practically unsupported suggestion, and in the absence of briefing and argument upon the question, decide whether or not the fixing of prices by the Office of Price Administration and Civilian Supply, at the time here in question, was authorized by existing legislation. The

Emergency Price Control Act, giving express authority to fix prices was not enacted until January 30, 1942. See 56 Stat. 23, 50 U.S.C.A.Appendix, Supp. II, § 901 et seq. We find it unnecessary to decide that question because we think that the price of $3.08 per pound represented a fair price and just compensation for the silk taken. Whether authorized or not, the process by which the Office of Price Administration arrived at that price seems to us to have been fair and reasonable. The tables given in our finding 5 show that during the period from September 1, 1930, to June 30, 1941, the average monthly price of silk exceeded $3.08 in only four months, and that it was less than $2.00 per pound during 67 months. The rise from $3.08 on July 21 to $3.57 on July 25 was an extraordinary fluctuation, and is not a measure of the fair value of the silk as of the later time when it was taken. There being no market, in the usual sense, for silk at the time of taking, the court must make its decision as to just compensation out of such materials as are at hand. Considering the cost of the silk here sued for, our finding 7 shows that only 280 bales, or less than 4 percent of it, had been bought during the last week of the free market, when the price went above $3.08. Considering then the nature of the events which caused the extraordinary rise in the price of silk in the few days preceding the closing of the market, the normal prices of silk as shown by the tables cited, and the cost of the silk to the owners, we conclude, as this court did in Walker et al. v. United States, 64 F.Supp. 135, 105 Ct. Cl. 553, and that the $3.08 which the plaintiffs were paid was not less than the fair value of their silk.

From our conclusion that the Government took the plaintiffs' silk on October 16, 1941, it follows that the plaintiffs are entitled to interest, not as interest, but as just compensation for the period from that date until they were, respectively, paid for their silk, since during that period they had neither the use of the silk nor the money value of it.

We further conclude that, the Government having taken the silk on October

16, but not having actually taken it out of the plaintiffs' possession until some months later, it was, in effect, being stored and handled by the plaintiffs on the Government's account. The plaintiffs may therefore recover the amounts expended for storage and handling after October 16.

The Japanese, when they sold and shipped it to this country, usually graded the silk one grade higher than tests in this country showed that it merited. The silk of several of the plaintiffs was downgraded when it was tested and turned over to the Government. As to three of the plaintiffs, it was upgraded. We do not understand the plaintiffs to assert that there was any error in the testing which produced these gradings. The plaintiffs were paid prices proportionate to the ceiling price on the standard grade of silk, hence this downgrading raises no question not already discussed.

The plaintiffs are entitled to recover the amounts set forth below:

Edward P. Stahel & Company, Inc., $201.

Interstate Hosiery Mills, Inc., $942.38.

Liberty Lace & Netting Works, a corporation, $1,112.48.

Cooper, Wells & Company, $2,805.12.

May McEwen Kaiser Company, $8,968.-97.

Oscar Heineman Corporation, $32,786.10.

Sakura Mills, Inc., $478.51.

C. J. Abegg and Emil Ringger, doing business as Abegg & Company, $409.23.

Real Silk Hosiery Mills, Inc., $2,356.10.

It is so ordered.

JONES, Chief Justice, and LITTLETON, Judge, concur.

WHITAKER, Judge (dissenting).

I agree with the opinion of the majority that the taking of plaintiffs' silk took place on October 16, 1941, but I do not agree that $3.08 represents just compensation. The price at which silk was selling on the last day on which there was a free market for the sale of silk was $3.57, and there is no doubt that the market price would have continued to rise except for the imposition by the Government of restrictions on transactions in silk, and the fixing of a ceiling price of $3.08.

In my opinion, the nearest we can come to fixing "just compensation" for the taking of plaintiffs' silk on October 16, 1941, is the price plaintiffs could have gotten for this silk on the last day on which there was a free market for it.

I do not think under the facts in these cases the ceiling price of $3.08 fixed by the Office of Price Administration and Civilian Supply had any legal effect in the determination of just compensation.

In the case of United States v. John J. Felin & Co., 1948, 68 S.Ct. 1238, three Justices of the Supreme Court expressed the opinion that the ceiling price was the measure of just compensation, but it did not appear in that case, as it does in these cases, that this ceiling price had been fixed prior to the time that the President had been granted statutory authority to fix prices. The first Act authorizing the President to fix prices was passed on January 30, 1942, '56 Stat. 23, Title 50 U.S.C.A.Appendix, Supp. II, § 901 et seq. The price of $3.08 was fixed by the Office of Price Administration and Civilian Supply on August 2, 1941, some months prior to the passage of this Act. The silk was taken on October 16, 1941, prior to the passage of this Act.

In my opinion, the fixing of this price on August 2, 1941, was without authority and of no legal effect. If so, it is to be disregarded, except for such evidentiary value as it may have.

The only body in this country with authority to fix prices is the Congress of the United States. It derives that power from section 1 of Article I of the Constitution which vests in the Congress "all legislative powers herein granted," and from section 8 of Article I, providing that "The Congress shall have Power To * * * provide for the common Defense and general Welfare of the United States * * * To declare War * * * To raise and support Armies * * *" and "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers * * *."

No article of the Constitution could possibly be construed to give the President or

any department of the executive branch of the Government authority to fix prices without congressional authorization. The President's power is executive. He is charged with the duty to "take care that the laws be faithfully executed," and he is Commander in Chief of the Army and Navy, but, except for his power to recommend measures, and his authority to participate in the making of treaties, and for his power of veto, he has no legislative power.

The plaintiffs assert in their briefs that the first legislative Act giving the President power to fix prices was passed on January 30, 1942, and the defendant does not deny this. We have found no statute from which any such power can be implied.

Under the Act of June 7, 1939, 53 Stat. 811, 50 U.S.C.A. § 98 et seq., he was given the power to acquire stocks of strategic and critical materials, and this power was broadened by the Acts of June 28, 1940, 54 Stat. 676, 50 U.S.C.A.Appendix, § 1151 et seq., and July 2, 1940, 54 Stat. 712, 50 U.S. C.A.Appendix, §§ 1171, 1172, and under the Act of May 31, 1941, 55 Stat. 236, 50 U.S.C.A.Appendix, § 1152, he was given the power to establish priorities and to allocate material, but from none of these Acts can any authority be inferred to fix the price of materials acquired by the Government nor the price at which an owner could sell his property to private individuals. The first such authorization, as we have stated, was on January 30, 1942.

Executive Order 8734 establishing the Office of Price Administration and Civilian Supply referred to no statute authorizing the President to fix prices. This order begins, "By virtue of the authority vested in me by the Constitution and the statutes"; but the particular statute giving this authority is not cited, nor is the section of the Constitution conferring such authority.

The Government in its briefs cite none, and, so far as I have been able to find, there is none.

The following Message to the Congress from the President recommending the passage of price-control legislation is significant (Senate Report No. 931 on H.R. 5990, pp. 4–5, 77th Congress, 2d Session):

"For 12 months we have tried to maintain a stable level of prices by enlisting the voluntary cooperation of business and through informal persuasive control. The effort has been widely supported because farsighted business leaders realize that their own true interests would be jeopardized by runaway inflation. But the existing authority over prices is indirect and circumscribed and operates through measures which are not appropriate or applicable in all circumstances. It has further been weakened by those who purport to recognize need for price stabilization yet challenge the existence of any effective power. In some cases, moreover, there has been evasion and bootlegging; in other cases the Office of Price Administration and Civilian Supply has been openly defied."

While the President is careful not to admit lack of authority for the regulations already promulgated, it is plain that he would like to be able to plant his feet on somewhat firmer ground.

Aside from whether or not a ceiling price fixed under congressional authority is controlling in determining just compensation, certainly a ceiling price fixed without congressional authorization is of no effect whatever.

However urgent it may have been to control prices at the time Executive Order 8734, establishing the Office of Price Administration and Civilian Supply, was issued on April 11, 1941, and however much the situation may have justified the President in issuing this order, even though he was without authority to do so, nevertheless, a price fixed under this order can have no effect in determining the just compensation to which plaintiffs are entitled under the Constitution.

By the foregoing I do not mean to imply that I agree that a ceiling price fixed under congressional authorization is conclusive in determining just compensation.

I think plaintiffs are entitled to recover at the rate of $3.57 a pound.

Judge HOWELL concurs in the foregoing opinion.