SOUTHERN CALIFORNIA EDISON CO., Limited, et al. v. UNITED STATES.

No. 46669.

United States Court of Claims.

July 10, 1950.

William W. Clary, Los Angeles, 'Cal., for plaintiffs. Gail C. Larkin, Bruce Renwick, O'Melveny & Myers, John P. Pollock, all of Los Angeles, Cal., and Peter Q. Nyce, Washington, D. C., were on the briefs.

William A. Stern, II, Washington, D. C., with whom was Assistant Attorney General H. G. Morison, for the defendant.

Before JONES, Chief Judge, and HOWELL, MADDEN, WHITAKER and LITTLETON, Judges.

JONES, Chief Judge.

This case requires a determination of fair and just compensation for the taking of two steam electric generating units including condensors and accessory equipment. The units were requisitioned during the war from Southern California Edison for shipment to Russia.

Edison is a public utility engaged in the business of generating, transmitting, and distributing electric energy for light, heat, and power in central and southern California. Edison relies principally on hydro-electric power, but it is necessary for the company to maintain steam plants as reserve. Steam units 7 and 8, each with an operating capacity of 42,500 kilowatts, were requisitioned by the United States in November 1942 and February 1943. The requisitionings were pursuant to 55 Stat. 742, as amended by 56 Stat. 176, 181, 50 U.S.C.A. Appendix, § 721, which gave the President power to requisition such property and directed him to determine fair and just compensation as of the time of requisitioning in accordance with the provision for just compensation in the Fifth Amendment.

Replacement of the requisitioned units was necessary; and arrangements were made with the War Production Board whereby another unit, designated as 8–R, with a capacity of 82,075 kilowatts, was made available to Edison. Installed at a cost of $2,483,185, it was ready for operation by November 1943. Edison at this time was still primarily a 50-cycle system. In fact, it was the only large utility in the United States still distributing electricity at a frequency of 50 cycles per second; the rest of the country used 60-cycle power. Much of the rest of the world, however, used 50 cycles. Units 7 and 8 were designed for and operated at 50 cycles only, as did Edison's other steam generators. Unit 8–R, however, was being built as a 60-cycle unit for another utility when the War Production Board ordered its production suspended. When permission was granted to complete it for Edison, it was redesigned to operate at either 50 or 60 cycles.

The plaintiffs and the defendant are far apart in what they regard as just compensation. The plaintiffs claim $2,630,000. The defendant asserts that the amount should be $653,850 and that since more than this sum has already been paid it is entitled to a refund. Like the blind men who tried to describe the elephant, each is partly in the right and both are in the wrong.

On July 16, 1943, plaintiffs filed proofs of claim with the Treasury Department aggregating $2,630,000 plus interest. The Secretary of the Treasury made a preliminary determination that fair and just compensation was $1,549,223. Plaintiffs objected, and a hearing was held before the Assistant General Counsel of the Treasury Department who recommended an award of $1,800,000 with interest. Plaintiffs rejected this award too, and on August 14, 1945, received $967,479.16, which was 50 percent, plus interest, of the $1,800,000 determined by the Secretary of the Treasury to be fair and just compensation. Pursuant to the statute under which the requisitionings were made plaintiffs brought suit in this court for $2,630,000 plus interest, less the amount already paid by the United States.

After the plaintiffs had presented their direct case, we granted defendant permission to file a counterclaim out of time. In its counterclaim the United States alleges that the Treasury's award of $1,800,000 was induced by Edison's misrepresentations that units 7 and 8 had a remaining service life of not less than 25 years. Defendant charges that prior to the Treasury hearings Edison had determined to seek permission to convert its system to 60 cycles as soon as the war was over, that its plans provided for conversion to be complete by 1950, and that it knew conversion would render units 7 and 8 obsolete and unusable. Defendant asserts that the requisitioned units had a market value of $653,850 which amount plus interest is the measure of compensation. Plaintiffs have already been paid $967,479.16; defendant counterclaims for $264,623.20.

The allegations of the counterclaim have not been sustained. Plaintiffs' witnesses before the hearing officer did assume a remaining life of 20 or 25 years, but it has not been shown that this was misrepresentation. On the contrary, we have found these estimates substantially correct. Furthermore, the hearing officer's opinion makes it quite clear that he was aware that Edison's 50-cycle production was unique in this country and that conversion was possible. However, we do hold that he failed to give proper consideration to the questions of when conversion would have occurred and at what cost.

We reject defendant's contention that the requisitioned units had a market value which determines plaintiffs' recovery. Defendant s witness Haetten testified that the fair market value of units 7 and 8 was $653,850. Mr. Haetten, who was in the business of buying and selling industrial machinery, had not himself handled any transaction involving generators the size of units 7 and 8. However, he testified that he knew of two sales of 60-cycle generators in January 1942. This falls short of establishing that there was, in fact, a market for this type of equipment at the time these units were requisitioned. Just and fair compensation cannot be predicated on market value where there are so few instances of sales of similar property. United States v. Toronto, Hamilton & Buffalo Navigation Co., 338 U.S. 396, 70 S.Ct. 217; Kimball Laundry Co. v. United States, 338 U.S. 1, 5, 69 S.Ct. 1434, 93 L.Ed. 1765, 7 A.L.R.2d 1280. The market value test is often not satisfactory in the valuation of public-utility property, which is not frequently bought and sold. Orgel, Valuation Under the Law of Eminent Domain (1936) p. 618. Then, too, in arriving at just compensation, we cannot disregard the value of the two units as a part of a system any more than we could assume that the second-hand value of an elevator would be fair compensation for its removal from a building. Units 7 and 8, although used principally as reserve, were operating parts of a going utility. If we were to apply the market-value test, we should want to know, not merely their value as units detached from the plant, but also the market value of the whole system, or at least of the whole plant of which they were a part, before and after the taking. See Puget Sound Power & Light Co. v. City of Puyallup, 9 Cir., 51 F.2d 688 and McCormick, Handbook on the Law of Damages (1935) p. 529. However, there was no market for these units; and the market-value test is inapplicable. Haetten's testimony as to market value, the only evidence of market value in the case, is not sufficient to establish such a value.

In Finding 22 we determined that the current net value of the property at reproduction costs at the time of taking was $1,412,296. This computation and those set out in the succeeding paragraphs and other relevant facts were given consideration in arriving at the ultimate determination of value.

In Findings 23-30 we determined that the value of the requisitioned property in terms of the adjusted cost of the replacement unit 8-R was $1,464,471. In reaching this result we considered the inevitability of conversion of the Edison system to 60-cycle output in ten years and the probability that units 7 and 8 would be converted at that time, the amount necessary in 1943 to accumulate a fund sufficient to pay for such conversion in ten years being $659,464. Valuation must be as of the time of taking. But it was inevitable in 1943 that the system would be converted within ten years. The current cost of meeting this inevitability was, therefore, an element of present value in 1943.

There were certain expenditures in connection with the removal of units 7 and 8 and the installation of unit 8-R which are not proper costs for capitalization. As set out in Finding 31, the net of these costs was $92,444. These are the only costs in the category of severance damages for which plaintiffs are entitled to be compensated. Plaintiffs' experts claimed large amounts for carrying charges on property made temporarily idle by the seizures. It has not been proved that such damages were actually sustained. Plaintiffs have not shown that the plant made temporarily idle was for that reason less profitable during the interval between the seizures and the installation of 8-R. We have not been shown, for example, that this idle equipment was out of Edison's rate-base during this period. See Orgel, op.cit., pp. 736-737.

It is a fact that the use of units 7 and 8 had been gradually reduced over the years. From 1924 to 1931 these units operated 42.5 percent of the maximum unit hours with an output of 28.7 percent of their maximum capacity. From the beginning of 1932 through October 1942 they operated only 3.52 percent of the time and their combined output was less than .2 of one percent of their maximum operating capacity. From 1935 to 1942 they operated only 1,850

unit-hours or about 1.3 percent of the time. They were largely valuable as stand-by reserves and for emergency use. The availability of power from Boulder Dam had much to do with the greatly reduced use of units 7 and 8 after 1935.

We have, however, allowed an item of $23,660, which was the reasonable estimate, made after the removal of 7 and 8, for the excess cost of operating units 4, 5, and 6 in lieu of either 7 or 8 until the installation of 8-R. This item is included in Finding 31 as part of the damages in connection with the requisitionings.

█ The Government offered to pay $1,800,000; the plaintiffs chose not to accept this offer. They elected to stand on whatever value they could prove in this court. Upon the facts as they have been more fully developed and presented to us we are called upon to determine that value. In reaching our determination of fair and just compensation we have had to choose the criteria which can properly be relied on in this case. We have not repeated in this opinion the computations made in our Findings of Fact. We have found that book value and earnings are not in this case true indices of value. Our principal guideposts have been the current net value of the property at reproduction costs at the time of taking and the cost of the replacement unit adjusted for its advantages and disadvantages as compared with the requisitioned units plus the net additional expenditures caused by the takings. We find that the value of the property was $1,500,000. This amount is allocable among the three requisitions as follows:

Requisition No. 13, November 24, 1942, 45% .............. $ 675,000
Requisition No. 14, February 1, 1943, 45% ................. 675,000
Requisition No. 15, February 1, 1943, 10% ................. 150,000
_____
1,500,000

█ Just compensation must include not only the value of the property at the time of taking but also a sum to compensate for delay in payment, and interest at a proper rate is a good measure for ascertaining this additional amount. Seaboard Air Line Ry. Co. v. United States, 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664. Plaintiffs claim that the requisitioned property was a part of the realty and that 40 U.S.C.A. § 258a requires that interest as a part of just compensation for the taking of realty be 6 percent. This statute is not applicable; it is not the statute under which plaintiffs' property was requisitioned. We hold that plaintiffs are entitled to interest at the rate of 4 percent per annum from the various requisition dates in addition to the $1,500,000 The interest is awarded as a part of just compensation. Since the offer of the Secretary of the Treasury was of an amount greater than that which we have found was the value of the taken property, interest as a part of just compensation on account of delay in payment does not run beyond August 14, 1945, the date on which plaintiffs received $967,479.16. Walker (A. D. Walker & Co.) v. United States, 64 F. Supp. 135, 105 Ct.Cl. 553. See also Luckenbach Steamship Co. v. United States, 272 U.S. 533, 47 S.Ct. 186, 71 L.Ed. 394 and Moore v. United States, 60 Ct.Cl. 326.

Plaintiffs are entitled to a judgment of $1,500,000; plus interest at 4 percent on $675,000 from November 24, 1942, to August 14, 1945, and on $825,000 from February 1, 1943, to August 14, 1945; less $967,479.16. The defendant's counterclaim is dismissed.

It is so ordered.

HOWELL, MADDEN, WHITAKER and LITTLETON, Judges, concur.