**HUGHES COMMUNICATIONS GALAXY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 91–1032C.**

United States Claims Court.

April 13, 1992.

and Space Administration, Washington, D.C., of counsel.

## OPINION

BRUGGINK, Judge.

This case concerns an alleged breach of contract or Fifth Amendment taking by the Government in the aftermath of the Space Shuttle Challenger disaster. This suit, along with a similar one addressed in the companion case of *American Satellite Co. v. United States*, 26 Cl.Ct. 146 (1992), also issued today, raises a number of difficult and unique issues. The plaintiff contends that the President's decision to remove the National Aeronautics and Space Administration ("NASA") from the business of launching commercial satellites damaged plaintiff in the amount of $288,454,000. The case is before the court on defendant's motion for summary judgment. For the reasons stated below, the motion is granted.

## FACTUAL BACKGROUND

In an attempt to help fund the fledgling Space Shuttle program, NASA embarked on a program in the early 1980s to develop a satellite launching capacity using the Shuttle[1] as its launch vehicle. NASA created a "Division of Customer Relations" that printed color sales brochures and developed an advertising campaign centered around the slogan "We Deliver." Touting the reliability and safety of manned launches, NASA further lured commercial clients with a detailed "Space Transportation System Marketing Plan" that stressed the economic benefits of using the Shuttle. The Shuttle's pricing was attractive because NASA was the recipient of government funding.

NASA was created by the National Aeronautics and Space Act of 1958, Pub.L. No. 85–568, 72 Stat. 426 (codified as amended at 42 U.S.C. §§ 2451–2484 (1988)), primarily as a research and development agency devoted to the exploration of space for scientific purposes.[2] At that time, the commer-

Clarence T. Kipps, Jr., with whom were Robert K. Huffman and Kevin C. Dwyer, Washington, D.C., for plaintiff. John J. Higgins, John T. Kuelbs, Jennifer A. Smolker, and Scott B. Tollefsen, Los Angeles, Cal., of counsel.

Peter G. Barber, with whom were Asst. Atty. Gen. Stuart M. Gerson, and David M. Cohen, Washington, D.C., for defendant. June W. Edwards, National Aeronautics

---

1. The term "Shuttle" will be used throughout this opinion to denote the fleet of Shuttles.

2. The legislative history accompanying the 1958 act states:

cial use of space was little more than the stuff of science fiction novels. *See* Isaac Asimov, *The Currents of Space* (1952). But as technology advanced, the potential for commercial ventures became clearer. The Government was among the first to get involved. In 1962, Congress passed legislation creating the Communications Satellite Corporation ("Comsat"), a quasi-private organization authorized to "plan, initiate, construct, own, manage and operate ... a commercial communications satellite system." 47 U.S.C. § 735(a)(1) (1962). The legislation provided that the incorporators and three of Comsat's 15 directors were to be appointed by the President, but that the corporation was to be operated for profit and was not a government agency. *See id.* §§ 731–733. On April 6, 1965, Comsat became NASA's initial commercial user when the corporation's first satellite was launched on a "reimbursable basis"[3] aboard a NASA rocket. Roger E. Bilstein, *Orders of Magnitude, A History of the NACA and NASA, 1915–1990,* at 83 (1989).

As the Sixties ended, NASA was becoming more like a service agency and less like a research and development agency. For the first time, in 1970, NASA launched more payloads for other organizations (Comsat, government agencies such as the Defense Department, and foreign governments) than for itself. *Id.* at 98. On January 5, 1972, as the manned Apollo moon missions were coming to a close, President Nixon announced plans to develop "an entirely new space transportation system." 8 Weekly Comp.Pres.Doc. 27 (Jan. 5, 1972). The focus of the system would be "a space vehicle that can shuttle repeatedly from earth to orbit and back," the Space Shuttle. *Id.* In the announcement, the President stated that the Shuttle "will go a long way toward delivering the rich benefits of practical space utilization and the valuable

spinoffs from space efforts into the daily lives of Americans and all people." *Id.*

The shift toward commercialization of the space program continued on October 9, 1972, when the President released a document entitled "United States Policy Governing the Provision of Launch Assistance." In it, the President set out an official policy that foreign and domestic commercial payloads would be accorded the same priority and charged equally for launch services.

The U.S. commitment to commercial use of space is also evidenced by an "Announcement of Administration Review" of "United States Space Activities" issued June 20, 1978. In the announcement, President Carter directed, inter alia, that:

The United States will pursue space activities to increase scientific knowledge, develop useful commercial and Government applications of space technology, and maintain United States leadership in space technology.

. . . .

The United States will encourage domestic commercial exploitation of space capabilities and systems for economic benefit and to promote the technological position of the United States. . . .

. . . .

The United States will develop, manage, and operate a fully operational Space Transportation System (STS) through NASA, in cooperation with the Department of Defense. The STS will service all authorized space users—domestic and foreign, commercial and governmental—and will provide launch priority and necessary security to national security missions while recognizing the essentially open character of the civil space program.

United States Space Activities, Announcement of Administration Review, 14 Weekly

The bill establishes a new civilian agency ... to develop a comprehensive program of research and development in aeronautical and space sciences and related matters (including the study and solution of the problems of manned and unmanned flight within and outside the earth's atmosphere and the development, construction, testing, and operation for

research purposes of aircraft, missiles, satellites, and other space vehicles.
H.Rep. No. 1770, 85th Cong., 2d Sess. (1958), *reprinted in* 1958 U.S.C.C.A.N. 3160, 3171.

3. A "reimbursable" payload is a payload whose owner at least partially reimburses NASA for launch costs incurred by the Government.

Comp.Pres.Doc. 1135, 1136–37 (June 20, 1978).

A similar indication of the Government's plans for marketing the Shuttle is the following statement made by President Carter in response to a question about his perception of the role of the United States in space over the next 10 years:

> I think the space shuttle capability that we will have will greatly expand the customer market for space services far beyond our own country. Other nations and private enterprises will now be using our space shuttle capability when they couldn't really use the very limited and tightly controlled space capability of independently launched missiles.

Remarks and a Question–and–Answer Session with Members of the American Press Institute, 14 Weekly Comp.Pres.Doc. 519–20 (Mar. 16, 1978).

Because the number of available slots for launch aboard the Shuttle was finite, it was clear that some system of priority had to be implemented to allocate among the different types of users. The earliest reference in the record to priority among Shuttle users is a document in the appendix to Hughes' brief which Hughes has titled "Response of Dr. Frosch to Written Question Submitted at Joint Hearing on November 9, 1978." Dr. Frosch[4] was asked, "Will DOD payloads have priority if insufficient Orbiters are available to accommodate all payloads?" Dr. Frosch's response was:

> The order of priority for Shuttle users in the event of a reduced operational fleet

has been established. Space programs requiring urgent STS support to maintain national security mission capabilities would come first. These would be followed by (a) significant science and technology missions and/or missions with launch windows constraints; (b) committed reimbursable missions, (c) routine science and technology and late request missions, and (d) space available requests.

There are several other instances in the record where these same levels of priority are mentioned.[5]

On August 6, 1982, President Reagan issued a "Space Assistance and Cooperation Policy," along with implementation guidelines to that policy which stated:

> With respect to the priority and scheduling for launching foreign payloads at U.S. launch sites, such launchings will be dealt with on the same basis as U.S. launchings. Each launching will be treated in terms of its own requirements and as an individual case. Once a payload is scheduled for launch, the launching agency will use its best efforts to meet the scheduling commitments. Should events arise which require rescheduling, the U.S. will consult with all affected users in an attempt to meet the needs of the users in an equitable manner.

Also issued on August 6, 1982, was a document entitled "United States Space Policy," which contained a paragraph nearly identical to the one quoted above. The only difference was that the latter doc-

---

4. Dr. Robert A. Frosch was the NASA Administrator from May 1977 until January 1981.

5. For example, note the similarity of the 1978 exchange to the following exchange between Lt. Gen. James A. Abrahamson, then head of the Shuttle program for NASA, and the House Subcommittee on Space Science and Applications in 1984:

 *QUESTION M–60:*
 In the case of conflicting needs for using the Shuttle, what would be the order of priorities—i.e., for national security missions, government R & D missions, private sector R & D missions, commercial satellite launches, foreign payloads, etc.?
 *ANSWER M–60:*

 In the event that a conflict arises in the utilization of the Space Shuttle the following prioritization will be in effect for Shuttle flights:

 (1) Missions with national security implications.

 (2) Missions with specific launch window requirements (e.g., planetary, Haley's comet, etc.).

 (3) Reimbursable missions including other U.S. Government, foreign and U.S. commercial payloads.

 (4) NASA research and development missions.

 (5) Standby and ancillary payloads (e.g., Hitchhiker, GAS, SSIP, middeck, etc.).

ument deleted the first sentence of the paragraph and named "NASA" as "the launching agency" and the party that "will consult with all affected users" in the event rescheduling is required. Thus, each payload in this commercial/foreign class of payloads was to receive equal priority. It was against this policy framework that NASA contracted with commercial customers for the use of the Shuttle as a satellite launch vehicle.

Both NASA and Congress intended that the Shuttle would become more economically self-sufficient as commercial customers, foreign and domestic, were added. Congress, in a report accompanying the NASA appropriations bill for fiscal year 1984, expressed its views on future Shuttle funding as follows:

> *Space Shuttle Marketing.* Technical evolution of the space shuttle has progressed sufficiently such that the development of the full potential for marketing the system needs to receive senior NASA management attention. The Committee [on Science and Technology] believes that NASA should use the expertise of the private sector to develop an effective marketing approach. Effective marketing of space shuttle capabilities to commercial and foreign customers should serve to decrease the government's share of operational costs and assure that the shuttle system achieves the full potential for which it was developed.

H.Rep. No. 65, 98th Cong., 1st Sess. 17 (1983).

From 1981 until 1986, the Space Shuttle fleet flew 24 successful missions, with launches coming as frequently as one per month. Ten of those missions carried commercial payloads; a total of 24 commercial satellites were deployed.[6]

On December 5, 1985, Hughes Communication Galaxy, Inc. ("Hughes") and the United States, represented by NASA, executed a Launch Services Agreement No. 1383–001 ("LSA"), under which NASA was to use its "best efforts" to launch ten satellites owned by Hughes aboard the Space Shuttle. The ten satellites were Hughes 393 class spacecraft, designated HC–9 through HC–18. NASA's obligations under the LSA were to remain in effect until September 30, 1994, or until all ten satellites were launched, whichever came first. On January 28, 1986, before any of Hughes' satellites could be launched, the Shuttle Challenger exploded shortly after take-off from the Kennedy Space Center at Cape Canaveral, Florida. As a result of the loss of the Challenger, the NASA Shuttle fleet was reduced from four Shuttles to three.

NASA's "We Deliver" marketing strategy must have been a success. In addition to the 24 commercial payloads already launched, NASA had LSAs to launch 44 other commercial payloads, including the ten Hughes satellites, at the time of the Challenger accident. These payloads were listed, along with the other payloads scheduled for launch, on a document called a manifest. The manifest showed what payloads were scheduled to be launched on which orbiter and when that orbiter was scheduled to be launched. The commercial payloads were listed on the Shuttle manifest in order of their "Planned" or "Firm Launch Date."[7] As of the date of the Challenger accident, Hughes' satellites

---

6. The first four missions were test missions. Of the remaining ten successful missions that did not carry commercial payloads, two were used by the Department of Defense, and eight carried scientific payloads, such as the Spacelab project.

7. The LSA defines "Planned Launch Date" as: the date, which initially defines the beginning of the interval during which launch is to occur, agreed to by the parties at the time of execution of the Agreement, at the time the Customer exercises a launch option given in this Agreement or at the time a Payload

launch is rescheduled to occur greater than one year thereafter.
Hughes Launch Services Agreement, Art XX, ¶ 21.
"Firm Launch Date" is defined as: the date established on or about one year before the Planned Launch Date or at the time a Payload launch is rescheduled to occur within one year after the date of rescheduling. The original Firm Launch Date defines the beginning of the reduced interval during which launch is to occur.
*Id.* ¶ 10.

filled slots 12, 17, 22, 26–28, 30–31, 34 and 35 on the commercial payload listing.

On February 7, 1986, Robert Tucker of NASA issued a telegraphic message for "Distribution," presumably to the commercial users of the Shuttle. The message referred to the Challenger accident and sought to assure the "customers" that:

> Regarding launches, once resumed we will endeavor to provide flight assignments to our commercial and foreign customers as close to the previously planned launch dates as feasible. However, it must be recognized this may not be possible in all cases due to specific constraints such as launch windows and other considerations. In the interim we recommend you proceed on the basis that your flight assignment will be maintained until we notify you of any change which may be required.

By Executive Order No. 12,546 dated February 3, 1986, President Reagan established a Commission chaired by former Secretary of State William P. Rogers to investigate the Challenger accident. On June 6, 1986, the Rogers Commission, as it came to be known, issued its report. It concluded that "[t]he decision to launch the Challenger was flawed." Report of the Presidential Commission on the Space Shuttle Challenger Accident 82 (June 6, 1986) [hereinafter *Rogers Comm'n Report.*] The report referred to evidence of concerns raised by NASA officials and employees of Morton Thiokol, the contractor that supplied the Solid Rocket Boosters ("SRBs"), that certain parts of the SRBs known as "O-rings" might fail if launch was attempted at temperatures of less than 53 degrees Fahrenheit. The temperature at the time of the Challenger launch was approximately 37 degrees.

Unfortunately, those officials in a position to abort the launch were "unaware of the recent history of problems concerning the O-rings and the joint and were unaware of the initial written recommendation of the

contractor advising against launch at temperatures below 53 degrees Fahrenheit and the continuing opposition of the engineers at Thiokol after the management reversed its position." *Rogers Comm'n Report* at 82; *see also id.* at 104. The Commission concluded that NASA's emphasis on having the Shuttle appear "operational," as opposed to simply "developmental," caused such immense pressure to launch that safety concerns were overlooked. *Id.* at 164–65.

The Rogers Commission also concluded that part of NASA's problem was its "legendary 'can-do' attitude" with respect to rescheduling of commercial payloads. *Id.* at 171. The report notes: "Customers occasionally have notified NASA Headquarters of a desire to change their scheduled launch date because of development problems, financial difficulties or changing market conditions. NASA generally accedes to these requests and has never imposed the penalties available." *Id.* at 167. The Commission then criticizes NASA's flexibility. "NASA was being too bold in shuffling manifests. The total resources available to the Shuttle program for allocation were fixed. As time went on, the agency had to focus those resources more and more on the near term—worrying about today's problem and not focusing on tomorrow's." *Id.* at 172. Thus, it appears that in the eyes of the Rogers Commission, the commercial responsibilities of the Shuttle were at least partially to blame for the Challenger accident.

In March 1986, reports appeared in the press that the White House Senior Interagency Group on Space ("SIG–Space")[8] was considering limiting access to the Shuttle to defense and scientific payloads. *See* Craig Covault, *Administration Formulates New Space Policy*, Aviation Wk. & Space Tech., Mar. 17, 1986, at 22; *NASA No-Launch Decision Put on Hold in Face of Congressional Opposition*, Comm. Daily, Mar. 17, 1986, at 4; David E. Sanger, *NASA Would Shift Some Launchings to*

---

**8.** SIG–Space was comprised of representatives from NASA, the Departments of Commerce, Defense, State and Transportation, the Joint Chiefs of Staff, the Central Intelligence Agency, and the Office of Management and Budget, and was chaired by the National Security Affairs Adviser, Admiral John Poindexter.

*Private Sector*, N.Y. Times, Mar. 12, 1986, at A1 [hereinafter *Sanger*]. Such a move would have forced commercial satellite owners to turn to commercial launch providers to launch their payloads. But not everyone within the Government agreed that this was the proper course for the space program. NASA was concerned that without commercial users of the Shuttle, its financial resources would be greatly diminished. Pitted against NASA in this debate were the Departments of Commerce and Transportation, which were under Presidential and Congressional orders [9] to assist in the development of a private commercial launch business in the United States. Proponents of such an industry had long complained that NASA's government subsidies made it impossible for a private firm to compete with NASA on price. *See Sanger* at A1.

On August 15, 1986, after months of hearings, testimony and debate on the future of the Shuttle program, the President issued the following statement:

> I am announcing today two steps that will ensure America's leadership in space exploration and utilization. First, the United States will, in FY 1987, start building a fourth space shuttle to take the place of the *Challenger*, which was destroyed on January 28th. This decision will bring our shuttle fleet up to strength and enable the United States to safely and energetically project a manned presence in space.

> Without the fourth orbiter, NASA's capabilities would be severely limited and long-term projects for development of space would have to be either postponed, or even canceled. A fourth orbiter will enable our shuttles to accomplish the mission for which they were originally intended and permit the United States to move forward with new, exciting endeavors like the building of a permanently manned space station.

> My second announcement concerns the fundamental direction of the space program. NASA and our shuttles will continue to lead the way, breaking new ground, pioneering new technology, and pushing back the frontiers. It has been determined, however, that NASA will no longer be in the business of launching private satellites.

> The private sector, with its ingenuity and cost effectiveness, will be playing an increasingly important role in the American space effort. Free enterprise corporations will become a highly competitive method of launching commercial satellites and doing those things which do not require a manned presence in space. These private firms are essential in clearing away the backlog that has built up during this time when our shuttles are being modified.

> We must always set our sights on tomorrow. NASA and our shuttles can't be committing their scarce resources to things which can be done better and cheaper by the private sector. Instead, NASA and the four shuttles should be dedicated to payloads important to national security and foreign policy, and, even more, on exploration, pioneering and developing new technologies and uses of space. NASA will keep America on the leading edge of change; the private sector will take over from there. Together, they will ensure that our country has a robust, balanced, and safe space program.

> It has been over 6 months since the tragic loss of the *Challenger* and her gallant crew. We have done everything humanly possible to discover the organizational and technical causes of the disaster and to correct the situation. The greatest tribute we can pay to those brave pathfinders who gave their lives on the *Challenger* is to move forward and rededicate ourselves to America's leadership in space.

Statement by the President, 22 Weekly Comp.Pres.Doc. 1103–04 (Aug. 15, 1986).

---

**9.** *See* Exec. Order No. 12,465, 49 Fed.Reg. 7211 (1984), *reprinted in* 42 U.S.C.A. § 2465 note (West Supp.1991); 49 U.S.C. app. §§ 2601–2623 (1984) (Office of Commercial Space Transportation of the Department of Transportation established to license and regulate private commercial launch activities).

From Hughes' perspective, the operative part of this announcement is the President's directive that "NASA will no longer be in the business of launching private satellites." The President's announcement left the Government with the problem of what to do with the 44 commercial payloads that were manifested as of the date of the Challenger accident. At a press conference also held on August 15, 1986, the President's press secretary, Larry Speakes, told reporters that a "working group" of the President's Economic Policy Council ("EPC")[10] would "set priorities among these 44" payloads and advise their owners as to when they might be launched. Press Briefing by Larry Speakes, et al., Aug. 15, 1986, at 2. Mr. Speakes would not be specific as to how the payloads would be prioritized, but he did suggest that special consideration would be given to those payloads that required a manned presence for deployment and those that had national security or foreign policy implications. *Id.* at 3.

The Government soon found, however, that extricating itself from the commercial launch business was more difficult than originally anticipated. The President directed the EPC to formulate a plan to help him decide what to do with the 44 remaining commercial payloads. There were several different interests to be considered, not the least of which was the desire, advanced by the Department of Transportation, to spur a private launch industry. Another concern, raised by the State Department, was the possibility that foreign policy complexities would arise if foreign users were eliminated. At the President's direction, NASA and the EPC grouped the 44 commercial payloads that were the subject of the outstanding LSAs into four classes. The list, entitled "Space Shuttle Contracts/Forty Four Commercial/Foreign Payloads," was broken down as follows:

I. SHUTTLE–UNIQUE (8)

II. NATIONAL SECURITY AND FOREIGN POLICY (17) OR (12) NOT INCLUDING FIVE THAT ARE ALSO SHUTTLE UNIQUE

III. COSTLY TO RETROFIT (11)

IV. REMAINDER (13)

The numbers in parentheses indicate how many payloads were included in each class. The first category, "Shuttle-unique," refers to payloads designed in such a way so as to require that they be launched using a manned vehicle, rather than by an expendable launch vehicle ("ELV"). The second category included those payloads deemed by the Government to have national security or foreign policy implications.[11] The third category consisted of payloads originally designed for Shuttle launch, but that could be retrofitted for launch aboard an ELV, albeit at a high cost. The remaining payloads fell into the fourth category.

The EPC provided the President with a plan for shifting the 44 commercial payloads from the Shuttle to the private sector. The plan offered three options from which the President could choose. Under the first option, only the first two categories of satellites (I. and II. above) would be manifested on the Shuttle. Under the second option, the 31 payloads falling within the first three categories (I., II., and III. above) would be included on the new post-Challenger manifest. The third option had all 44 commercial payloads being scheduled for Shuttle launch. NASA, still hoping for a more economically self-sufficient Shuttle program, argued in favor of either the sec-

10. The Economic Policy Council was created by the President in 1985 to advise him on "national and international economic policy." Statement on the Creation of two Cabinet–Level Bodies, 1985 Pub. Papers 437 (Apr. 11, 1985). The council consisted of the "Secretaries of State, Treasury, Agriculture, Commerce, and Labor, the Director of the Office of Management and Budget, the United States Trade Representative, and the Chairman of the Council of Economic Advisers." *Id.* Mr. Speakes said at the press conference, however, that NASA, the National Security Council, and the Department of Transportation were also represented in the "working group" of the EPC. Press Briefing by Larry Speakes, et. al., Aug. 15, 1986, at 2.

11. It is unclear from the record whether NASA, the EPC or some other group was responsible for determining which payloads had national security or foreign policy implications. Hughes does not dispute that its satellites do not qualify for this category.

ond or third options, so that at least it could launch 31 payloads, if not all 44. The Department of Transportation, on the other hand, favored the cancellation of all of the LSAs, in order to foster a more rapid development of a private ELV industry. The EPC decided to recommend the first option, manifesting only those commercial payloads that were shuttle-unique or had national security or foreign policy implications.

On September 25, 1986, Alfred H. Kingon, the President's Cabinet Secretary, sent a memorandum to NASA's Administrator, Dr. James C. Fletcher, announcing that the President adopted the EPC recommendation. None of Hughes' HC-series satellites qualified for either national security, foreign policy, or shuttle-unique status. Three of the satellites were classified as "Costly to Retrofit," and the remaining seven were classified in the group entitled "Remainder."

On October 3, 1986, NASA issued a telegraphic message addressed to the "Commercial and Foreign Customers" of the Shuttle.[12] The message announced the new manifest for the Shuttle. The new manifest was comprised solely of those 20 payloads that met the criteria set forth in the President's order, and did not include any of the HC-series satellites. The telegraphic message stated: "Within the priority category foreign and commercial, the priority has been given to those payloads which are shuttle-unique and these which have national security and foreign policy considerations. These as a group, to the extent practicable have been manifested using the pre [Challenger] sequence as a guideline." The message offered several reasons why the new manifest was necessary. Among the reasons cited were: "the Rogers Commission and its associated recommendations; ... and the President's decision to proceed with a replacement orbiter and to remove the space shuttle from the competition for launching private satellites."

By letter dated October 30, 1986, NASA formally informed Hughes that there were no launch dates on the current manifest for the HC-series payloads. The letter explained that the new manifest "reflects current White House policy and represents NASA's judgment on how best to satisfy launch requirements which far exceed current capacity." The letter went on to state:

It appears almost certain you will not be provided launch services either prior to or after your current contract expires. At the very least, it can be said with absolute certainty that your payloads will be delayed far in excess of the nine-month period described in Article VII, sub-paragraph 2.b. of Parts II and III of your Launch Services Agreement (LSA). Thus, should you wish to terminate your LSA prior to expiration, Article VII provides you may do so based on these delays. Upon termination, your payments to NASA will be refunded in accordance with the terms of the LSA.

As of the date of this opinion, NASA has flown 21 successful Shuttle missions since the Challenger accident. However, only one of the twenty commercial payloads on the post-Challenger manifest has been launched.[13]

## DISCUSSION

The complaint contains two counts. Count I alleges that the Government breached the LSA. Count II alleges that Hughes' contract rights were taken without compensation in violation of the Fifth Amendment. The two issues are closely related, in that, if there was no breach of contract, in all probability, Hughes had no

---

12. Neither of the parties in this case included a copy of the October 3, 1986 message in the record. A copy was included, however, in the record of the companion case, *American Satellite.* The court finds that Hughes did receive the message (or at least notice of its contents) since reference to the message is made in a letter dated October 30, 1986, from NASA to Hughes. That letter was included in the record in this case and is discussed below.

13. Hughes Communications' SYNCOM–IV–5 was launched on STS–32 in January 1990. This satellite was determined to fit both the shuttle-unique and national security exceptions and was not one of the ten Hughes satellites that are the subject of this litigation.

property interest that was taken. On the contrary, if there was a breach of contract, there would normally be no reason to consider a takings analysis. One of the Government's defenses may bridge the gap between the two theories, however. Defendant contends that even if the facts otherwise might give rise to a breach of contract, there is no contractual liability here, because NASA's refusal to schedule a launch for Hughes' satellites was due to the President's decision to change policy with respect to commercial use of the Shuttle. This latter act, NASA contends, insulates the Government, acting in a contractual capacity, under the sovereign act doctrine. In the event the sovereign act doctrine precludes liability for breach of contract, the question then posed is whether plaintiff can still prove a taking.

At the heart of any discussion of the complex issues raised in this case is the question of what deal the parties struck. Was there a binding contract, and if so, what were the Government's obligations under it?

There are a number of unusual features of the LSA, not the least of which is the subject matter itself. It would be naive of the court, much less the parties, not to recognize that a contract to send a satellite into space aboard a reusable rocket is fundamentally different, at least for the present, from sending a package across the country on a bus. The risks were different, not only in degree, but in kind. In addition, the court takes judicial notice that the space program has, since its inception, been burdened with considerations of national security and foreign affairs. Furthermore, it is readily apparent from Presidential statements and actions, as well as from legislation and related materials, that the space program in general and the Shuttle in particular has been, even well before the events of 1986, a tool of government policy.[14]

There are also the specific provisions of the LSA itself. Without considering for a moment the enforceability of these provisions, or whether they were breached, the court cites them merely to demonstrate that the agreement was colored, from beginning to end, with the parties' understanding that their arrangement was unique. Any construction of the agreement which ignores this fact is unrealistic.

The LSA provides in Article I that: "[a]ll Launch and Associated Services to be furnished by NASA to the Customer under this Agreement shall be so furnished by NASA using its best efforts." While "best efforts" contracts are commonly held to be enforceable, it is telling to note that NASA did not promise to launch, but only to use its best efforts to launch.

Article II, ¶ 3 provides: *"Period of Performance*—NASA's obligation to provide Shuttle Launch and Associated Services to the Customer under this Agreement shall remain in force through September 30, 1994 (unless mutually extended by NASA and the Customer) or until all obligations and responsibilities have been fulfilled, whichever occurs first." Thus, the LSA would expire by its own terms in 1994, whether Hughes satellites had been launched or not.

The LSA also provides that both NASA and Hughes have the right to delay or postpone a scheduled payload launch. LSA Art. IV, ¶¶ 2, 4. Both parties may defer or cancel payload operations after liftoff. *Id.* ¶¶ 3, 5. Hughes has the additional right to terminate the LSA virtually at any time and only has to pay the costs actually incurred by NASA as of the date of the termination. LSA Art. VII, ¶ 2.

NASA also has a right to terminate the LSA, but its right to do so is somewhat

14. For instance, in 1985, when Congress and NASA were concerned with competition from the European ELV company Arianespace, a new Shuttle pricing policy was enacted. One of the purposes for the policy was "the enhancement of the international competitive position of the United States." 42 U.S.C. § 2466a(4) (1985); *see also Martin Marietta Corp. v. International Tele-* *communications Satellite Org. (Intelsat),* 763 F.Supp. 1327, 1333 (D.Md.1991) (finding that Congress had legislated public policy by requiring Shuttle users to agree to contractual waivers for all tort claims, including those for gross negligence). Numerous other instances are cited in the opinion in *American Satellite,* at 154–156.

more limited than Hughes'. Article VII, paragraph 1.a. provides:

> NASA shall have the right to Terminate, in whole or in part, its commitment under this Agreement to furnish the Launch and Associated Services requested by the Customer (i) upon a declaration of war by the United States, (ii) upon a declaration of national emergency by the Congress of the United States, (iii) upon a failure of the Congress of the United States to provide NASA adequate appropriations, as indicated in Article XIV of this Agreement, or (iv) upon a determination in writing that NASA is required to Terminate such services for Reasons Beyond NASA's Control.

The LSA defines "Reasons Beyond NASA's Control" as:

> reasons which include, but are not limited to, acts of God or of the public enemy; acts of the United States Government other than NASA, in either its sovereign or contractual capacity; fires; floods; epidemics; quarantine restrictions; strikes; freight embargoes; or unusually severe weather which make impractical NASA's or its contractor's or subcontractor's performance of Launch and Associated Services.

LSA Art. XX, ¶ 24.

The LSA purports to limit the ability of Hughes to bring claims against the Government. Article V, paragraph 4 provides, in relevant part:

> Without affecting the right of the Customer to pursue the procedure under the Disputes provision set forth in Article XVIII of this Agreement, the Customer shall not make any claim against the United States Government or the United States Government's contractors and subcontractors for Damage or other relief for any delay (including a Deferral, Delay, Suspension or Postponement) in the provision of any Launch or Associated Services or for the non-performance

or improper performance of Launch and Associated Services....

The extent of NASA's obligations was further subject to the availability of appropriations. Article XIV provides:

> It is recognized that the United States Government's ability to perform its obligations under this Agreement is subject to availability of adequate appropriations. If adequate appropriations are not available, NASA shall seek to obtain adequate appropriations to perform its obligations under this Agreement. If adequate appropriations are not forthcoming, this shall be a basis for NASA to Terminate its obligations under this Agreement pursuant to Article VII, Paragraph 1. of this Agreement [quoted above]. It is recognized that the Customer has the right to Terminate this Agreement for any reason, but subject to the provisions of Article VII, Paragraph 2. of this Agreement.

■ While no single one of these provisions is unheard of, collectively they create a very unusual document.[15] It is sufficiently unusual that it raises the question of whether the obligations are so illusory that a contract was not formed. The Government does not take that position, however, and the court is constrained to interpret the contract in such a way that, if possible, it is sustained. *Torncello v. United States*, 231 Ct.Cl. 20, 27, 681 F.2d 756, 761 (1982). In any event, as discussed below, in considering the plaintiff's various breach contentions, the court finds that there were mutual obligations, but that there was no breach.

Plainly the LSA cannot be breached by mere failure to launch. The Government, through NASA, only obligated itself to use its best efforts to launch ten Hughes satellites. LSA Art. I. That the parties contemplated that there could be performance without all ten, or even any one satellite

---

**15.** As early as 1981, concerns were raised within the commercial satellite industry that the LSA provided NASA with too many "escape" clauses. Sheila Footer, Legal Issues and Answers for Commercial Users of the Space Shuttle, XIII Trans.L.J. 87, 94–95 (1983). NASA answered these concerns by noting that the LSA also provided the users the right to terminate at any time for any reason. *Id.* Apparently, with the passage of time, the users grew comfortable enough with the escape language to enter into the LSAs anyway.

being launched is clear from the above-quoted "Period of Performance" language of Art. II, paragraph 3.

█ What would clearly have been a breach is if NASA, without legal excuse, made no effort to perform—if it in effect committed an anticipatory breach. This is precisely what Hughes claims is the effect of the letter of October 30, 1986. When viewed in isolation, the letter, while holding out little hope of rescheduled launch dates for any of Hughes' satellites, falls short of an outright repudiation. Mr. Culbertson, General Manager of NASA, wrote that it appeared "almost certain" that Hughes would not be provided launch services either during or after the contract performance period. The letter went on to encourage plaintiff to terminate to get return of its payments.

The court finds that the letter was not entirely consistent with the President's actions, however. The President had announced that, with certain exceptions later found not to apply to Hughes, *no* more commercial use would be made of the Shuttle. Unless NASA re-classified the Hughes satellites to fit within one of the exceptions to the President's ban on commercial payloads, it would have been a violation of the President's directive to launch plaintiff's satellites.[16] NASA was obviously trying to let down plaintiff easy, or avoid a charge of anticipatory breach, but as a practical matter, the failure of the Hughes' satellites to meet the EPC's shuttle-unique or national security/foreign affairs classifications was fatal to any chance at a launch.

When viewed in the context of the President's various statements and the revised manifests, the letter of October 30 was an announcement by NASA that it would not *try* to launch Hughes' satellites in accordance with the LSA. The LSA incorporated, as between commercial users, those priorities set forth in the August 6, 1982 policy statement, which did not differentiate between commercial users. Rather, NASA announced that it was constrained by "the

priorities from which we have developed this manifest," i.e., the President's direction that only certain types of commercial payloads would be flown. In the absence of some legal justification, therefore, this would have constituted an anticipatory breach.

*Was there a termination?*

█ The Government has a number of arguments, drawn from the language of the LSA, as to why there was no breach. In other words, it contends that the LSA permitted the Government's actions. One such argument is based on the language concerning the period of performance. The Government argues that since there was no guarantee of a launch, the mere failure to launch cannot be a breach. The problem with this position is that it is not the mere failure to launch that Hughes complains of. Rather, it is the failure of the Government to use its best efforts to launch. A best efforts clause can have two effects. It can not only exculpate for failure to achieve performance, but it can also affirmatively obligate. An announcement by NASA that it would not try to launch Hughes' satellites would be inconsistent with the latter obligation.

The Government also points to the "Right of NASA to Terminate" provision in Article VII of the LSA. This provision, quoted above, is certainly a generous grant to NASA. In relevant substance, and read in conjunction with the definition of "Reasons Beyond NASA's Control," it grants NASA the right to terminate due to any act of the Government, whether in its contractual or sovereign capacity. The difficulty with reliance on these provisions, however, is that NASA did not formally terminate. Defendant's present argument is that "the President's directive to NASA, concerning future use of the shuttle, was a 'determination in writing that [requires] NASA ... to terminate [Hughes'] services for Reasons Beyond NASA's control.'" Brief of June 20, 1991 at 8. To take that argument to its logical conclusion undercuts the Govern-

---

16. For a discussion on the difficulty encountered by another commercial user attempting to have its satellite reclassified to meet the nation-al security exception, see *American Satellite,* at 150–51.

ment's general position in this litigation—namely that the LSA was in fact a contract. One party to a contract cannot simply arrogate to itself the right not to perform for no reason at all. Otherwise, there would be no consideration or mutuality of obligation. Such a reading would also be inconsistent with the "best efforts" language of the preamble.

The court agrees with the defendant that the combined effect of the President's actions was a de facto termination. At the time, however, NASA expressed a different view. In fact, the October 30 letter is very plainly an effort not to terminate. It is unnecessary, however, for the court to resolve whether the termination clause was invoked by NASA, because, in addressing the Government's primary argument below, it is apparent that NASA could have terminated, but that termination was not necessary to avoid liability.

*Was the LSA subject to changes in policy?*

[redacted] Part IV, Article XV of the LSA is entitled "Services Consistent With United States' Obligations, Laws, And Published Policies." It provides that:

> "NASA shall provide Launch and Associated Services under this Agreement to the extent consistent with the United States' obligations ..., United States' law and United States' published policy."

It is the Government's contention that the President's statement of August 15, 1986, as amplified by the press release, and by the Memorandum of September 25, constitutes "published policy" of the United States. As such, it altered the parties' assumption that the August 1982 policy statement would be controlling with respect to prioritizing as between commercial users.

At the time the LSA was executed, the parties' expectations about prioritization were set out at Article IV at Para. 1 a. The LSA recites that:

> With respect to launch priority and scheduling, NASA will provide launch and Associated Services in accordance with the United States policy governing launch assistance approved by the President of the United States on August 6, 1982. Consistent with this policy, NASA will generally treat all comparable payloads on the same basis....

The August 6, 1982 policy statement, quoted above at page 5, was thus incorporated into the LSA. The Government contends, however, that Article IV, Para. 1 a. is subordinated to Article XV.

The Government's argument succeeds only under certain circumstances. First, it depends on the validity of the President's action in changing the policy. Second, the President's statements had to constitute "published policy." Third, Article XV must have contemplated compliance not only with law and policy extant at the time of the LSA, specifically Article IV, but also with changes in law and policy over the term of the agreement.

The first two issues are addressed fully in *American Satellite*, at 153–58 & n. 20. There we hold that the President's actions were not illegal, and that they constituted "published policy." As we explained there, whatever value the commercial users had in the LSA arose out of their scheduling relative to other commercial users in light of the President's August 1982 policy statement. It would be ironic indeed if Hughes could successfully question the authority and methodology of a change in that policy made in similar fashion by the President at a later time. The same analysis and conclusions apply full weight here.

Hughes, however, argues that the "United States' published policy" referred to in Article XV does not include changes to that policy that might take place after the execution of the LSA. It points to the fact that the more specific provision, Article IV, ought to control the more general statement in Article XV. For several reasons, the court disagrees.

First of all, the contract ought to be read in such a way that both provisions make sense. *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir. 1983); *Hol-Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 395, 351 F.2d 972,

979 (1965). If Article XV is static, it is difficult to view it as anything other than redundant to Article IV.

More importantly, however, Article XV is a specific provision subordinating the bargain to law and policy. Even in the absence of such a provision, recent decisions of the Supreme Court and other courts demonstrate great reluctance to insulate contract provisions from the impact of subsequent legislative and executive directives. This is particularly the case with respect to subject matters that are highly regulated. In *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986), the Supreme Court considered whether any contractual rights of the plaintiffs were affected by a policy change articulated by Congress in an amendment to the Social Security Act. When Congress first passed the Social Security Act in 1935, it had doubts as to the constitutionality of taxing state employees. Because of these doubts, Congress exempted state and local governments from the mandatory participation in the Social Security system. In 1950, the States pressured Congress to enact § 418 of the Act that would allow the States to voluntarily participate in the Social Security System. States could sign up under § 418 by entering into a "§ 418 Agreement." Section 418 also allowed the States to terminate their § 418 Agreements and withdraw from the system. In 1983, in response to a study showing that more State employees were leaving the system than were entering, and sensing that the Social Security System was in financial difficulty, Congress amended § 418 to eliminate the withdrawal provision.

At the time of the 1983 amendment, California had attempted to terminate its § 418 Agreement with respect to several of its political subdivisions. The plaintiffs, a group of employees of public agencies within those subdivisions, alleged that the amending of § 418 deprived them of their contractual right to withdraw from the Social Security System in violation of the Fifth Amendment takings clause. We will discuss the takings portion of Hughes' claim below, but the Court's reasoning as to the contractual expectations of the *Public Agencies* plaintiffs is instructive on the issue of whether Article XV purported to freeze in time the August 6, 1982 policy. As to whether the plaintiffs had a vested contractual right to withdraw from the system, the Court stated:

> we have declined in the context of commercial contracts to find that a "sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in" the contract. *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 148 [102 S.Ct. 894, 907, 71 L.Ed.2d 21] (1982). Rather, we have emphasized that "[w]ithout regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." *Ibid.* Therefore, contractual arrangements, including those to which the sovereign itself is party, "remain subject to subsequent legislation" by the sovereign. *Id.,* at 147 [102 S.Ct. at 907] ... [C]ontracts should be construed, if possible, to avoid foreclosing exercise of sovereign authority.

*Public Agencies,* 477 U.S. at 52–53, 106 S.Ct. at 2397.

A recent Ninth Circuit decision that discusses *Public Agencies* is *Peterson v. United States Department of Interior,* 899 F.2d 799 (9th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 567, 112 L.Ed.2d 574 (1990). The plaintiffs in *Peterson* were water districts that had entered into contracts with the Department of the Interior to receive water. In 1982, Congress amended the federal reclamation legislation so as to reduce the amount of water the districts were entitled to receive. The plaintiffs alleged that the amendment breached their contracts with the Department. They claimed that prior law did not include a provision expressly reserving the right to amend, as did the Social Security Act in *Public Agencies.* The court, however, rejected this argument. Though *Public Agencies* and its predecessor cases on that issue concerned statutes expressly re-

serving to Congress the right to repeal the legislation, the court held that "nothing in those cases suggests that it is an absolute requirement that Congress expressly reserve in the controlling statute the right to amend the statute or governmental contracts entered under it." *Peterson*, 899 F.2d at 808. In fact, the court noted that "governmental contracts should be interpreted against the backdrop of the legislative scheme that authorized them, and our interpretation of ambiguous terms or implied covenants can only be made in the light of the policies underlying the controlling legislation." *Id.* at 807 (citing *F.H.A. v. The Darlington, Inc.*, 358 U.S. 84, 87–88, 79 S.Ct. 141, 144, 3 L.Ed.2d 132 (1958)). *See also Chang v. United States*, 859 F.2d 893 (Fed.Cir.1988) (imposition of sanctions against Libya, resulting in termination of employment contracts between plaintiffs and Libyan corporation, did not constitute interference with distinct investment-backed expectations due to overwhelming public knowledge of strained relations between the two countries at the time contracts were executed); *Minnesota Gas Co. v. Public Serv. Comm'n*, 523 F.2d 581 (8th Cir.1975) (gas company and city cannot by contract insulate themselves from subsequent state rate regulations), *cert. denied*, 424 U.S. 915, 96 S.Ct. 1114, 47 L.Ed.2d 320 (1976); *Harwell v. Growth Programs, Inc.*, 451 F.2d 240, 244 (5th Cir.1971) ("Anyone dealing in securities today must be charged with the knowledge that they are operating in a closely regulated field in which the public interest and public policy play a dominant part."), *cert. denied*, 409 U.S. 876, 93 S.Ct. 126, 34 L.Ed.2d 129 (1972).

In *Guaranty Financial Services, Inc. v. Ryan*, 928 F.2d 994 (11th Cir.1991), the court discussed whether an alleged contract was breached by the subsequent change in the regulatory scheme that existed at the time of the formation of the agreement. In 1987, the plaintiff, as part of a plan to acquire a failing savings and loan association, executed an agreement with the Federal Savings and Loan Insurance Corporation ("FSLIC") that allowed the plaintiff, Guaranty, to amortize an intangible asset known as "supervisory good-

will" over a twenty-five year period. In 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") which provided, inter alia, that supervisory goodwill cannot be used in calculating a thrift's core capital after January 1, 1995, and that no supervisory goodwill can be amortized over more than twenty year period. The FSLIC was dissolved pursuant to FIRREA, and the Office of Thrift Supervision ("OTS") was charged with the enforcement the FIRREA statute. The OTS decided that the act applied to all financial institutions, regardless of whether the institution had executed a supervisory goodwill agreement. Guaranty argued that the OTS had breached the 1987 agreement by applying FIRREA to Guaranty and sought an injunction against future enforcement of the statute against it.

The Eleventh Circuit, reversing the district court's grant of a preliminary injunction, held that the contract with the Government allowed the Government to change the regulations, notwithstanding the adverse effect those changes might have on the plaintiff. *Ryan*, 928 F.2d at 999. The court pointed to several parts of the agreement that expressly acknowledged that the regulatory scheme was subject to change. *Id.* After noting that the agreement must be read so as to give meaning to those provisions, the court stated:

> We interpret the forbearance provision to mean that the [government] agencies would allow Guaranty to treat supervisory goodwill as regulatory capital so long as the regulatory [scheme] remained as it was when the contract was signed. The agencies, in other words, granted Guaranty an exception to the rules of the game, and promised that the exception would be valid so long as the rules stayed the same. But the agencies, at the same time they made that promise, also unambiguously warned Guaranty that the rules might later change to Guaranty's detriment. By signing the contract, Guaranty took that chance, in effect wagering the chance that the rules

would be changed against the potential return if they were not.

*Id.*

In the present case, not only did the LSA not "surrender" the Government's sovereign power "in unmistakable terms," but in fact, the LSA expressly cautions that NASA's performance had to be consistent with published policy. After September 1986, performance pursuant to the 1982 priorities would not have been "consistent" with the new policy.

That the agreement was subject to a fluctuating policy environment should have been apparent from other provisions as well. The "Right of NASA to Terminate" clause, when read in conjunction with the definition for "Reasons Beyond NASA's Control", as well as the "Availability of Appropriations" clause, hardly suggest that NASA was holding out the 1982 launch policy as being immune to change. Interpreting these clauses "against the backdrop" of the space program, with its history of policy changes and its importance to national security and foreign and domestic policy goals, it would be foolhardy for the parties to contemplate that NASA's performance would be conditioned upon a static space policy. *See F.H.A. v. The Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958) ("Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end."); *see also Peterson*, 899 F.2d at 807. It should have been clear to Hughes that space policy was subject to frequent reassessment, and that the interplay between public and private use of the Shuttle was fluid. It should also have been apparent that the initiator of most changes in policy was the President, and that he generally acted with the support of Congress.[17] Hughes was "wagering the chance that the rules would be changed against the potential return if they were not." *Ryan*, 928 F.2d at 999.[18]

Based on the foregoing, it is plain that Article XV contemplates that the parties' obligations would continually be adapted to changing law and policy. The opposite conclusion would have the effect of allowing NASA to contract away Congressional and Presidential power to set space policy for the entire term of the LSA, twelve years.

■ Hughes advances two additional reasons that Article XV cannot be enforced as defendant wishes. First, Hughes argues that if it had understood Article XV to mean what the defendant contends, it never would have consented to an arrangement whereby the parties' agreement was subject to an overriding possibility that there might be a change in policy with respect to commercial use of the Shuttle. Hughes contends that there are facts in dispute that permit introduction of parol evidence as to the parties' contracting expectations, and that require further discovery. Hughes' second contention is that defendant's construction would mean the

---

17. Note, for example, the similarity of the following language from the Launch Services Purchase Act of 1990 to the President's August 15, 1986 statement and the subsequent policy announced in the October 3, 1986 telegraphic message:

Commercial payloads may not be accepted for launch as primary payloads on the space shuttle unless the Administrator of [NASA] determines that—

(1) the payload requires the unique capabilities of the space shuttle; or

(2) launching of the payload on the space shuttle is important for either national security or foreign policy purposes.

42 U.S.C.A. § 2465f(a) (West Supp.1991). *See generally* discussion in *American Satellite*, at 154–56, of Congressional iteration of Presidential policy pronouncements.

18. It is important to note here the "potential return" Hughes would have received had the rules not changed. The price of the entire Shuttle cargo bay for a post–1988 launch was $74 million in 1982 dollars. LSA Article I ¶ 3.1. The preliminary manifests prepared by NASA just after the Challenger accident show Hughes satellites as sharing each flight on which they were scheduled with at least two other payloads. Accordingly, the cost to Hughes would be approximately one third of the total cost of the Shuttle bay. Proponents of a "full cost recovery" pricing policy estimated that the price for the Shuttle's bay should have been between $129 million and $188 million. Hughes Opposition Brief Appendix at 134, 152.

agreement "was not binding on the Government." Brief of Oct. 31, 1991.

To support its first contention, Hughes offers the declaration of Michael A. Berta, who is now the Manager of the Defense Systems Division of the Space and Communications Group of Hughes Aircraft Company, plaintiff's parent company. During the negotiation of the LSA, Mr. Berta was Vice President of Space Systems Acquisition for plaintiff, and was the "principal negotiator" for plaintiff on the LSA. Mr. Berta states:

> Hughes Galaxy would not have contracted with the United States Government for launch services had the LSA permitted the United States Government to escape without liability its contractual commitment to use its best efforts to launch Hughes Galaxy's satellites on the shuttle by adopting a policy that NASA would no longer be in the business of launching commercial satellites or that Hughes Galaxy's satellites would be dropped from the Space Shuttle manifest.

Declaration of Michael A. Berta, Oct. 29, 1991, at ¶ 12.

■ It is axiomatic that parol evidence cannot be used to alter the terms of an integrated document, in the absence of ambiguity. The question of whether the document is ambiguous is a matter of law for the court to decide. *Framlau Corp. v. United States*, 215 Ct.Cl. 185, 194, 568 F.2d 687, 690 (1977). If the court finds ambiguity in the document, the court's next task is to ascertain the intent of the parties by viewing the outward manifestations of that intent. *David Nassif Assocs. v. United States*, 214 Ct.Cl. 407, 557 F.2d 249 (1977) ("Since contractual obligations are to be ascertained from objective manifestations of intent, plaintiff's mental reservations are legally irrelevant."); *Societe Cotonniere Du Tonkin v. United States*, 145 Ct.Cl. 426, 439, 171 F.Supp. 951, 958 (1959). Hughes' evidence, however, reflects little more than its subjective intent, and thus is not relevant in construing the agreement. Hughes offers no evidence as to whether it had concerns about the Article contemporaneous with the negotiations of the LSA, or

whether such concerns were communicated to NASA. Thus, its evidence misses the mark.

■ Hughes' final challenge to the validity of defendant's proposed construction of Article XV is that permitting changes in policy, including changes directed at use of the Shuttle itself, would mean that the Government's promises were illusory. The court disagrees. First, it is plain that until the policy changed, the Government would be bound to follow the priorities set out in the August 1982 policy statement. Second, and more important, the Government's right in its contractual capacity to rely on a clause as broad as Article XV comes impressed with an obligation to exercise that right in good faith. Every contract carries with it an implied obligation on both parties to conduct themselves reasonably, and not to interfere with the performance of the other party. *Petrofsky v. United States*, 222 Ct.Cl. 450, 455, 616 F.2d 494, 497 (1980), *cert. denied*, 450 U.S. 968, 101 S.Ct. 1488, 67 L.Ed.2d 618 (1981); *PBI Elec. Corp. v. United States*, 17 Cl.Ct. 128, 133 (1989). The Government impliedly promises to act in good faith and "invoke its great power of a sovereign act when and only when and to the extent necessary to carry out its essential governmental functions." *Air Terminal Servs., Inc. v. United States*, 165 Ct.Cl. 525, 538, 330 F.2d 974, 981 (1964) (Jones, C.J., dissenting).

The strength of that limitation, however, raises a question that goes directly to the heart of the Government's main defense, namely, whether the President's actions were those of the Government acting in its sovereign capacity. For the reasons discussed below, it is the court's view that Article XV incorporates into the agreement the sovereign act defense, that the defense has limitations which keep the contract from being illusory, and that the defense was properly invoked.

### Were the President's actions those of the sovereign?

Article XV is, in effect, an attempt to capture the sovereign act defense in the

contract.[19] The presence of Article XV is proof that the Government is *not* promising not to interfere with performance of the contract through a sovereign act. In fact, the Government is expressly leaving open the possibility that such an act may occur.[20] The question becomes whether, given the context of this contract and the breadth of Article XV, this minimal constraint has sufficient substance to prevent the Government from simply walking away from any obligations. In the court's view, it does, so long as the change in policy is a sovereign act.

■■■■■ The sovereign act doctrine provides a defense to a breach of contract claim that arises when the Government, acting in its capacity as sovereign, interferes with the performance of a contract to which it is a party. *Hedstrom Lumber Co. v. United States*, 7 Cl.Ct. 16, 25 (1984). Certain limitations to the defense have developed. The act must have been taken in the national interest, it must be public and general in its application, and it must not be arbitrary and unreasonable. *Horowitz v. United States*, 267 U.S. 458, 461, 45 S.Ct. 344, 345, 69 L.Ed. 736 (1925) (quoting *Jones v. United States*, 1 Ct.Cl. 383, 384–85 (1865)). In addition, the alleged sovereign act must be legal for the defense to apply. *O'Neill v. United States*, 231 Ct.Cl. 823, 826 (1982). Acts that are motivated primarily by a desire to save money do not provide a defense. *See Perry v. United States*, 294 U.S. 330, 352–53, 55 S.Ct. 432, 435–36, 79 L.Ed. 912 (1935); *Lynch v. United States*, 292 U.S. 571, 580, 54 S.Ct. 840, 844, 78 L.Ed. 1434 (1934). As this court ruled earlier in the companion case, "[m]ere invocation of the sovereign act doc-

trine is not a talisman." *American Satellite Co. v. United States*, 20 Cl.Ct. 710, 715 (1990).

The court concludes that the same analysis should apply to Article XV, and thus that it cannot be invoked if the change in policy was not public or general, if it was arbitrary or unreasonable, or if it was primarily motivated by a desire to save money by avoiding contract liabilities. While this construction of Article XV obviously forces commercial users to cope with a great deal of uncertainty, the residual obligation in the Government is not ephemeral.

Hughes challenges whether the decision to get the Shuttle out of the commercial launch market was in the national interest and hence, public and general. It questions both the facial validity of the reasons expressed by the President for changing policy, and also seeks to inquire into any unexpressed motives of the President and the EPC. The latter point is easily disposed of.

■■■■■ Hughes claims that summary judgment is improper because it has not been allowed to investigate the deliberations that led to the President's decision. Hughes seeks discovery as to why the EPC recommended the course of action that it did, presumably hoping to find some ulterior motive behind the change in policy. However, as the court in *United States Cane Sugar Refiners' Ass'n v. Block*, 683 F.2d 399 (C.C.P.A.1982), held:

> [the plaintiff's] concentration on what it insists was the President's real purpose is simply irrelevant. Grist it may be for the executive or legislative mills; grist it cannot be for the mills of the judicial

---

19. It was not NASA's only effort. Article VII Para. 1 (right of NASA to terminate) and Article IV, Para. 4(e) (right of NASA to postpone launch), when read with the definition of "Reasons Beyond NASA's Control," is very explicit in that regard.

20. Because of this express provision that the Government's obligations are conditioned upon United States policy, this case is different from *Gerhardt F. Meyne Co. v. United States,* 110 Ct.Cl. 527, 76 F.Supp. 811 (1948). In *Meyne,* the Government had represented that a certain road would be available to the plaintiff. The court

found that that representation was tantamount to an implied promise that the Government would pay the plaintiff for any increased costs it incurred due to the unavailability of the road. *Meyne,* 110 Ct.Cl. at 550, 76 F.Supp. 811; *accord Amino Bros. Co. v. United States,* 178 Ct.Cl. 515, 525, 372 F.2d 485, 491 (Government cannot contract away sovereign powers, but it can agree to pay for their exercise), *cert. denied,* 389 U.S. 846, 88 S.Ct. 98, 19 L.Ed.2d 112 (1967). We decline to imply such a promise in the present case because of the express provision incorporating the sovereign act doctrine.

branch. In sum, let the President's action be authorized, and let his action be within the authorizing provisions of the law he cites, and the role of the judiciary is at an end.

*United States Cane Sugar*, 683 F.2d at 404 (footnote omitted); *accord Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983) ("When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential."); *Ottinger v. United States*, 123 Ct.Cl. 23, 48, 106 F.Supp. 198, 204 (1952) ("We of course express no opinion of the wisdom of the policy in general or in wartime conditions when labor is scarce and timely completion of jobs is urgent."). Because we have held that the President's actions were authorized, "his motives, his reasoning, his findings of facts requiring the action, and his judgment, are immune from judicial scrutiny." *United States Cane Sugar*, 683 F.2d at 404 (citing *United States v. George S. Bush & Co.*, 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259 (1940)).[21]

■■■ As to the substance of the announced rationale, Hughes argues that it reflects, not a national interest, but a concern with promoting a private ELV industry. The suggestion is that such a motivation is not embraced by the sovereign act doctrine.

The President's announcement of August 15, 1986 set forth a rationale for the policy change:

> The private sector ... will be playing an increasingly important role in the American space effort. Free enterprise corporations will become a highly competitive method of launching commercial satellites and doing those things which do not require a manned presence in space.

> These private firms are essential in clearing up the backlog that has built up during this time when our shuttles are being modified.

> NASA and our shuttles can't be committing their scarce resources to things which can be done better and cheaper by the private sector. Instead, NASA and the four shuttles should be dedicated to payloads important to national security and foreign policy, and, even more, on exploration, pioneering, and developing new technologies and uses of space.

These paragraphs suggest strongly that the shift to a private sector ELV launch capacity was not simply to promote a new business, but to facilitate a larger purpose—freeing up the Shuttle for the Government's own use. The President is essentially asserting that a private ELV industry is important to maintaining a strong American presence in space. The Shuttle fleet is a scarce resource, made scarcer by the loss of the Challenger.

These statements harmonize with the Congressional statements on the development of the private ELV industry. Congress enacted the Commercial Space Launch Act in 1984, which contained express declarations that "the United States should encourage private sector launches and associated services," and that the purpose of the Act was "to facilitate the strengthening and expansion of the United States space transportation infrastructure." 49 U.S.C. App. §§ 2601(7), 2602(4) (1984); *see also* Exec. Order No. 12,465, 49 Fed.Reg. 7211 (1984) (designating the Department of Transportation as the "lead agency for encouraging and facilitating commercial ELV activities by the United States private sector").

As noted by Senator Hollings during discussion of the 1987 NASA Authorization bill, which was pocket-vetoed by the Presi-

---

**21.** Hughes also disputes the President's determination that the change in space policy was necessary because of the reduced number of launch slots available after the loss of the Challenger. To support its contention that the Challenger accident did not necessitate the policy change, Hughes has submitted copies of several manifests presumably prepared by NASA in the time between the Challenger accident and Dr. Fletcher's announcement of the President's decision. At least two of Hughes' HC series satellites appear on each of the manifests. Hughes claims this proves that a fact issue exists as to whether there was enough capacity on the Shuttle to accommodate Hughes' payloads.

dent, "[t]he shuttle is and always will be a research and development vehicle. It was never intended to be commercial airliner, and its treatment as such led to unrealistic schedules and phenomenal launch pressures." 132 Cong.Rec. 30,243 (1986).

The bona fides and the sovereign character of the President's actions are apparent from these facts. The Rogers Commission had concluded that the integrity of the program was compromised by the presence of obligations to commercial users, and even Hughes notes that "[t]he loss of the *Challenger* created the environment for the reargument of the roles of the shuttle and the U.S. ELV launch industry for the launch of commercial satellites...." Brief of Oct. 31, 1991, at 28.

■ As a related point, Hughes argues that the President's real motive was to eliminate the Government's contractual obligations to it and others, and thereby promote a private ELV industry. Hughes claims it was unfairly singled out. The determinative question on this issue is not whether the plaintiff was the only one affected, but whether the plaintiff was the only one targeted. *See, e.g., Wah Chang Corp. v. United States*, 151 Ct.Cl. 41, 282 F.2d 728 (1960) (Court allowed sovereign act defense although only plaintiff was injured by the government act). Plaintiff cites three decisions of the Court of Claims to prove that it was. In *Everett Plywood Corp. v. United States*, 227 Ct.Cl. 415, 651 F.2d 723 (1981), the Government terminated the plaintiff's timber contract after determining that the logging of the area in question would cause severe ecological damage. The court recognized the importance of the environmental policy cited by Government as the reason for the termination, but held that the act was neither public nor general. *Everett*, 227 Ct.Cl. at 429, 651 F.2d at 731. The court opined that "[i]t would have been an entirely different case if Congress had passed a law immediately prohibiting all cutting in all public forests, but this unilateral termination does not constitute a sovereign act that excuses the government from breach damages." *Everett*, 227 Ct.Cl. at 429, 651 F.2d at 732.

The court refused to apply the sovereign act defense because the allegedly "sovereign" acts were taken solely within the context of the contract at bar and were prompted by concern that "continued performance would have been unwise." *Id.*

A similar result obtained in *Sunswick Corp. v. United States*, 109 Ct.Cl. 772, 75 F.Supp. 221, *cert. denied*, 334 U.S. 827, 68 S.Ct. 1337, 92 L.Ed. 1755 (1948). There, the plaintiff sued for the increased labor costs it incurred performing a government contract as the result of an order by the Government that the plaintiff increase the wages it paid to its carpenters. The contract specifications established the wages that the carpenters were to be paid, and designated those to be "the maximum wages to be paid, subject, however, to Executive Order No. 9250 and the General Orders and Regulations issued thereunder." Executive Order No. 9250, aimed at "the stabilization of the national economy," authorized the National War Labor Board ("NWLB") to set wage rates for certain government contracts. The NWLB subsequently delegated its wage setting authority to the Wage Adjustment Board. After a complaint by the union representing the plaintiff's carpenters, the Wage Adjustment Board ordered the wage increase.

The court found that the Board's action unfairly targeted the plaintiff, and thus was not public and general. *Sunswick*, 109 Ct.Cl. at 797, 75 F.Supp. 221. In so holding, the court stated:

> We may concede, for the purposes of this case, that if the ... Board ... had had under consideration and had decided pursuant to Executive Order 9250 a question of national policy concerning wages or wage rates generally or those in a particular industry in connection with the stabilization of the national economy and had decided that for economic reasons to authorize a general wage increase, ... such a broad policy decision applicable to everyone alike would be one which might properly be classified as a sovereign act for which no recovery could be had by a contractor for increased costs occasioned thereby.

*Id.* at 799, 75 F.Supp. 221. Instead, the court found that the plaintiff's increased wage costs were due to the Board's specific order directed at a particular contract. *Id.* at 797, 75 F.Supp. 221.

Plaintiff also cites *Freedman v. United States*, 162 Ct.Cl. 390, 320 F.2d 359 (1963). In that case, the court held that the sovereign act defense did not relieve the Government from liability for its cancellation of a contract to sell surplus Army tanks. Hughes cites *Freedman* for the proposition that "Government actions that target rights under a contract with the U.S. are not 'public and general,' regardless of the reasons that exist for those actions." Brief of Oct. 31, 1991, at 39.

The court finds the present circumstances distinguishable from these cases. In *Freedman*, the impediments erected to performance of the contract were generated solely within the confines of that contract. Moreover, the court held that "[t]here was no conceivable foreign policy obstacle to following that course, only a pecuniary drawback. The existence of this court is proof enough that the desire to save money is a poor reason to break an outstanding promise." *Freedman*, 162 Ct. Cl. at 402, 320 F.2d at 366. Plainly, the debate generated in the present case between NASA, the State Department, the Defense Department and within the White House went far beyond a single contractor. Moreover, the debate certainly involved legitimate concerns of foreign policy.

The decision of the President to pull NASA out of the commercial launch business was directed at all future flights of the Shuttle, not just those already subject to contract. In fact, EPC was instructed to come up with a policy that salvaged some of the commercial payloads, and ultimately it did so in a principled fashion. Unlike *Everett* and *Sunswick*, the President's decision marked a dramatic, high level, and wide-ranging change from earlier policy. The fact that there was a relatively small number of companies affected does not alter the fact that they were treated generically as the result of a larger, untargeted decision to pull NASA out of the business of sharing the Shuttle with commercial users.

 Hughes finally contends that the decision to include only those commercial payloads important for foreign policy or national security reasons was arbitrary and unreasonable. It suggests that by delaying the implementation of the policy, eventually all 44 payloads could have been launched, and there would be no reason for playing musical chairs with the commercial slots.

There are obvious practical difficulties with that argument.[22] More importantly, however, having concluded that the overall policy was "general and public," it is not the court's role to second guess when it should be implemented. Obviously the President, acting with the advice of the EPC, could have delayed implementation for many years till all the existing contracts were honored. Or implementation could have been immediate, allowing for no more commercial payloads. Or, as was the case, those commercial payloads that the President judged to have the highest priority—national security and foreign policy related—could have been accommodated. Any of these options would have been rational and the process of choosing between them is not a proper subject for this court's inquiry. The court has no meaningful basis for evaluating the reasons expressed by the President for his choice. On their face they are certainly not arbitrary.

It follows from this discussion that the decision to end commercial use of the Shuttle, and to then eliminate from the current manifest all commercial payloads that could not be characterized as carrying security or foreign policy implications, was a sovereign act. It prevented NASA, the contracting agency, from honoring its obligations under the LSA. This would have been the case even in the absence of Article XV, but due to the presence of that clause, there can be no question that the agreement was not breached.

---

**22.** In the six years since the Challenger disaster, there have been 21 launches of the Shuttle. Only one of the twenty priority commercial payloads was included.

*Was there a taking?*

 Having found that the LSA is a binding contract, and that the change in space policy was a sovereign act, we turn to the question of whether that sovereign act effectuated a Fifth Amendment taking of Hughes' property. The Government argues that "the sovereign act defense not only bars breach of contract claims, but also takings claims." To support this argument, the Government quotes the following language from *Finks v. United States*, 184 Ct.Cl. 480, 489, 395 F.2d 999, 1004, *cert. denied*, 393 U.S. 960, 89 S.Ct. 398, 21 L.Ed.2d 374 (1968): "Nor is an interference with the use of property a compensable taking if it is the result of a sovereign act." The Government, however, misreads the holding from the *Finks* case. The *Finks* court did not apply the sovereign act defense as bar to recovery on a takings claim. The court focused instead on the extent to which property rights were infringed upon, rather than the nature of the government act that caused the infringement. The former analysis must precede the latter. The Court of Claims decision in *Franco–Italian Packing Co. v. United States*, 130 Ct.Cl. 736, 128 F.Supp. 408 (1955), is instructive in this regard.

> The distinction between an exercise of the eminent domain power that is compensable under the fifth amendment and an exercise of police power is that in a compensable exercise of the eminent domain power, a property interest is taken from the owner and applied to the public use because the use of such property is beneficial to the public ... [whereas] in the exercise of the police power, the owner's property interest is restricted or infringed upon because his continued use of the property is or would otherwise be injurious to the public welfare.

**23.** *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986).

**24.** While it is clear that contracts rights are property for the purposes of the takings clause, that clause is rarely used if the case can be adequately resolved using a contract analysis.

*Franco–Italian*, 130 Ct.Cl. at 745–46, 128 F.Supp. 408. The Government's argument that the sovereign act doctrine is a bar to takings claims confuses this distinction. *Edward P. Stahel & Co. v. United States*, 111 Ct.Cl. 682, 78 F.Supp. 800 (1948), *cert. denied*, 336 U.S. 951, 69 S.Ct. 878, 883, 93 L.Ed. 1106 (1949), is to similar effect:

> The Government urges that it was, by its priority orders, merely making rules in its sovereign capacity and should not be pecuniarily liable for their harmful consequences to individuals. It cites *Horowitz v. United States*, 267 U.S. 458 [45 S.Ct. 344, 69 L.Ed. 736 (1925)] ... and the several cases in this Court ... which discuss this doctrine. But the taking of property by the sovereign for public use, though unquestionably an act of sovereignty, does not, under our Constitution, leave the sovereign immune from having to pay compensation for the taking. The Fifth Amendment expressly imposes liability.

*Stahel*, 111 Ct.Cl. at 743, 78 F.Supp. at 804. In this case, however, our analysis need not go that far. We must first determine whether the plaintiff's positioning on the pre-Challenger manifest, in light of the court's conclusions above, fits the definition of "property" within meaning of the Fifth Amendment. We find that it does not.

As we discuss above, the sovereign act doctrine was built into the LSA by virtue of the inclusion of Article XV. Thus, many of the points raised above in describing the parties' expectations regarding Article XV are equally applicable here. The plaintiff could not have had a "distinct investment-backed expectation" [23] that its slot on the Shuttle manifest would be unaffected by subsequent sovereign acts.

 No property interest existed, therefore, to implicate a takings analysis. [24]

As this court noted in *Marathon Oil Co. v. United States*, 16 Cl.Ct. 332 (1989):

> [T]he concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. *See J.J. Henry Co. v. United States*, 188 Ct.Cl. 39, 46, 411 F.2d 1246, 1249 (1969). In such instances interference with such contrac-

**146**

Hughes had no legitimate right to expect more than the contract offered. The events anticipated in the contract occurred. Consequently, it is unnecessary to further consider whether the Government's actions constitute a taking.[25]

### CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted. The Clerk is directed to dismiss the complaint. No costs.

tual rights generally gives rise to a breach claim not a taking claim.
*Marathon Oil,* 16 Cl.Ct. at 338–39 (quoting *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 769, 572 F.2d 786, 818 (1978)).

25. Even in the absence of Article XV, Hughes could not demonstrate a taking for the reasons discussed in *American Satellite,* at 158–61.